IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,301

STATE OF KANSAS,
*Appellee*,

v.

DENIS ANTONIO ALFARO-VALLEDA,
*Appellant*.

SYLLABUS BY THE COURT

1.

Autopsy photographs that illustrate the nature and extent of wounds are admissible when they corroborate the testimony of a witness, including a witness who is not a pathologist or a medical examiner.

2.

If a prosecutor uses the words "we know" when drawing inferences for the jury rather than recounting uncontroverted evidence, the prosecutor errs even if drawing a reasonable inference.

3.

When a judge admits evidence for a limited purpose but does not instruct the jury about the limitation, an appellate court applies a clear error standard under K.S.A. 2020 Supp. 22-3414 if the party does not object before the jury retires to consider its verdict.

1

4.

A district court judge does not err by listing on the verdict form the choice of finding a criminal defendant guilty before listing the choice of finding the defendant not guilty.

5.

An appellate court reviewing a cumulative error claim examines the errors in context, considering whether the district court judge addressed any error; the nature and number of errors; the relationship, if any, between the errors; and the strength of the evidence. It applies the constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), if any of the errors are constitutional. For the court to affirm a jury verdict under that test, the party benefitting from any error must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome.

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed January 7, 2022. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.: Denis Alfaro-Valleda directly appeals his conviction of first-degree premeditated murder. Alfaro-Valleda raises five issues:  (1) error in the admission

of an autopsy photograph that he argues was more prejudicial than probative; (2) prosecutorial error in closing argument arising from the prosecutor's repeated use of "we know" before discussing controverted facts; (3) error in failing to instruct the jury on the limited purpose for which the judge admitted the evidence; (4) error in listing the word "guilty" before the words "not guilty" on the verdict form; and (5) error that cumulatively prejudiced Alfaro-Valleda. We conclude the prosecutor erred in the closing arguments, and we presume the district court erred in not instructing the jury on the limited purpose for which the judge admitted some evidence. But we conclude those errors did not affect the jury's verdict. We therefore affirm Alfaro-Valleda's conviction.

FACTS AND PROCEDURAL HISTORY

A jury convicted Alfaro-Valleda of the first-degree premeditated murder of Mike Arita-Hurtado.

Evidence admitted at trial revealed that, in the hours before his death, Arita-Hurtado took his girlfriend and her young son to a New Year's Eve party at an apartment he shared with his sister. Arita-Hurtado and his girlfriend had been dating for only a brief time. After midnight, Arita-Hurtado left the party to drive his girlfriend and her son to their home.

Sometime later, as other guests began to leave the party, they heard several gunshots. After the gunfire ended, one guest left to check what had happened. He quickly returned, reporting, "They killed Mike." Arita-Hurtado's sister ran out and found her brother lying face down near his car. The car was running, and the driver's door was open. As they stood there, Arita-Hurtado's phone rang. His sister answered it and spoke with Arita-Hurtado's girlfriend who, when asked, said she did not know why anyone

3

would shoot Arita-Hurtado. The girlfriend then said that she had talked to Arita-Hurtado while he was driving back to his sister's. He had told her that someone was following him.

Patrol officers, responding to a dispatch call of shots fired, found Arita-Hurtado lying face down near a car that was still running. He had suffered several gunshot wounds. A crime scene investigator found .380 shell casings nearby.

At Alfaro-Valleda's trial, the lead detective detailed the investigation, which included interviewing Arita-Hurtado's girlfriend and accessing her cell phone. During this investigation, officers focused on Alfaro-Valleda as a potential suspect. Alfaro-Valleda had been in a relationship with Arita-Hurtado's girlfriend and had fathered her child.

Police obtained Alfaro-Valleda's cell phone data information and assigned an officer to surveil Alfaro-Valleda by using cell tower pings to find the location of his mobile phone (and presumably him). While watching Alfaro-Valleda's house, an officer saw a small child arrive at the house. He later observed a black Dodge Journey with tinted windows arrive and leave the house. Sometime after the black Dodge Journey left, a cell tower ping suggested Alfaro-Valleda's phone was southbound on I-35. The officer and his partner left to look for the black Dodge Journey, and they asked the Kansas Highway Patrol (KHP) for help. KHP located and stopped the vehicle. The car had three occupants, two adults and a child. The officer saw no baggage or luggage in the car after it was stopped. The officer identified one of the adults as Alfaro-Valleda and the child as Alfaro-Valleda's son. A detective discovered Alfaro-Valleda had Mexican currency on him when stopped.

4

Jesus Herrera drove the black Dodge Journey. Law enforcement officers took both men into custody and interviewed them separately. Herrera told officers that Alfaro-Valleda said he needed to get out of town because he was accused of a killing. He reported knowing that Alfaro-Valleda had owned a gun, although he did not see one in the Journey.

At trial, Herrera testified that he had worked in construction with Alfaro-Valleda. Alfaro-Valleda called Herrera on New Year's Day and asked for a ride to Texas. Herrera picked Alfaro-Valleda and his son up at a house. Herrera confirmed that Alfaro-Valleda did not have any bags or food for the trip. Herrera also testified that he knew Alfaro-Valleda had a handgun because Herrera had bought a magazine for it, which he had shipped to Alfaro-Valleda's house.

An officer testified his investigation revealed the magazine was a Hi-Point magazine that Herrera ordered because Alfaro-Valleda did not have a debit or credit card he could use to do so. The magazine could hold two different caliber bullets, one of which matched the caliber used to kill Arita-Hurtado.

Officers interviewed Alfaro-Valleda on two separate days. They first interviewed him in Ottawa, near where KHP had stopped Herrera's vehicle. During this interview, Alfaro-Valleda denied any knowledge of the shooting. Officers interviewed him again the next day after moving Alfaro-Valleda to Kansas City. During this interview, Alfaro-Valleda made a statement that implicated him in the murder.

At trial, a detective authenticated Alfaro-Valleda's second statement. An audio recording of the second statement, which was in Spanish, was played to the jury; the jury could review an English-translated transcript while it played. Alfaro-Valleda told officers

that his son's mother urged him to show his love for her by killing "whoever she was with." He believed she set him up, saying, "She provided the rope[,] and I only provided the neck," which he explained meant, "she set the trap up[,] and I fell into it."

The State also presented a witness who moved Alfaro-Valleda's car from his house to another location. And they showed the jury video footage from along the path between Arita-Hurtado's girlfriend's house and his sister's apartment. Officers detailed the path and pointed out images of two cars that resembled those of Arita-Hurtado and Alfaro-Valleda. But nothing specifically showed the vehicles belonged to Arita-Hurtado or Alfaro-Valleda because the license plates were not visible in any of the video clips.

Alfaro-Valleda tried to undermine the State's case through cross-examination of State witnesses. For example, cross-examination highlighted that his girlfriend had told detectives that she perceived that no one, including Alfaro-Valleda, was aware of her relationship with Arita-Hurtado; the investigation never found the firearm used to kill Arita-Hurtado; no DNA evidence supported the State's case; and no eyewitnesses saw the murder.

Alfaro-Valleda called one defense witness, who was married to his uncle and who spent New Year's Eve at her home with Alfaro-Valleda and others. She testified that Alfaro-Valleda left the house for about 10 to 12 minutes around 11:30 p.m. He otherwise remained and was still in the house around 1 a.m., when she went to bed. She said he was very drunk, but otherwise acting normally, both before she went to bed and when she woke up the next morning. On cross, she conceded her door was closed to her bedroom and she may not have known if Alfaro-Valleda left the house.

6

A jury convicted Alfaro-Valleda of first-degree murder, and a district court judge imposed a life sentence with no possibility of parole for 50 years. Alfaro-Valleda timely appealed, and we have jurisdiction under K.S.A. 2020 Supp. 22-3601(b)(3).

ANALYSIS

ISSUE 1: *No error in admitting an autopsy photograph*

Alfaro-Valleda phrases his first issue on appeal as: "The district court erred by admitting an autopsy photograph even though the state did not introduce testimony from a coroner." The photograph, identified as Exhibit 73, shows Arita-Hurtado's head where it had been opened by the coroner to reveal a bullet.

Before trial, the defense objected to all autopsy photographs. The district court judge ruled on the defense's objections, admitting some photographs. Then, during a trial recess during which the jury was not in the courtroom, the admissibility of Exhibit 73 was again discussed by the judge and the attorneys. Defense counsel renewed his objection and pointed out the autopsy photographs were the same as those "from last time. There are a few that are duplicative of—a farther away and a close-up photograph of a wound on a few instances . . . . I would just continue my objection to that Court's ruling." The judge responded that he thought the State had withdrawn its request to introduce photographs that were subject to the defense's cumulative evidence objection during the previous hearing. At that point an off-the-record discussion occurred.

When the record reopened, defense counsel said, "[F]or the record, it's going to be State's Exhibit 73." He then explained, "This is the photograph that I objected to last time as gruesome." The district court judge questioned the prosecutor about relevance and

7

then, before the prosecutor could answer, said, "I assume you're going to have your pathologist here to testify?" The State responded it had decided to not call a pathologist as a witness because the one who performed the autopsy had left the country, omitting pathologist testimony would speed the trial, and the defense was not disputing the cause of death. Instead, the State planned to call the crime scene investigator who attended the autopsy and to have that witness authenticate the photographs he took during the autopsy.

The court again asked, "Then what's the relevance of the photographs?" The prosecutor replied, "It's going to show where the bullet was removed from the victim. And I believe any layman can see that a bullet in the head is not good." The State also pointed out that this was the only photograph that shows where the pathologist removed the bullet from Arita-Hurtado's head.

The defense responded by explaining that "there's really no objection to the fact that [Arita-Hurtado] is deceased. I think it's just the State showing that . . . they collected multiple bullets. . . . [S]o I don't have an objection, Judge, by any means. But I do object to the . . . gruesomeness of this one."

The judge then ruled that Exhibit 73 "does not appear to rise to the level to be so gruesome that it would prejudice the defense or would prejudice the jury in such a way. It appears to be relevant, so the Court will allow it."

When defense counsel again objected just before the photograph's admission, the judge ruled, "I'll allow that being relevant and find it's not unduly prejudicial."

The crime scene investigator then testified about each of 29 photographic exhibits. The State reviewed each exhibit with the witness. For most exhibits, the State asked just

one question about the exhibit and the witness answered with one or two sentences describing the photograph. This was the case for Exhibit 73:

> "Q:     And State's Exhibit No. 73, (indicating).
> "A:     That is the—it's upside down. That's the bullet that was removed from the victim's skull."

After the investigator testified about each exhibit, the State formally offered the autopsy photographs for admission, defense counsel objected only to Exhibit 73, and another discussion occurred outside the hearing of the jury. The judge asked the prosecutor, "And as I understand, it would assist him as to where he recovered bullets." The prosecutor responded, "Yes," and the judge ruled that he would allow the admission of Exhibit 73, noting he would find it was relevant and not unduly prejudicial. The exhibits were then published to the jury.

On appeal, Alfaro-Valleda again objects to the admission of Exhibit 73. He argues that "[b]ecause the state did not call a coroner to testify in this case . . . the legion of cases . . . allowing gruesome photographs to be admitted to 'assist a pathologist in explaining the cause of death' are inapplicable." The defense argues that other photographs showed the wounds inflicted and that showing the gruesome autopsy photograph without the coroner's testimony had only one purpose—to inflame the minds of the jurors.

In response, the State contends Alfaro-Valleda did not preserve the objections he is now raising on appeal. It also argues the district court judge did not err in finding that Exhibit 73 was relevant and that its probative value outweighed any prejudice arising because of a juror's potential sensitivity to photographs of an autopsy.

9

1.1 *Preservation*

We first consider the State's argument that Alfaro-Valleda did not preserve the issue he raises on appeal because he made a different objection during trial. The basis for the State's argument is K.S.A. 60-404, which requires a "timely interposed" objection that is stated so "as to make clear the specific ground of objection" before a verdict can be reversed because of error in introducing evidence.

Here, Alfaro-Valleda timely interposed an objection to Exhibit 73. The question is whether the grounds for the objection were specific to the issue on appeal. We have explained that the Legislature's purpose for enacting the requirements that an objection to evidence must be both timely and specific is to give the district court "the opportunity to conduct the trial without using . . . tainted evidence, and thus avoid possible reversal and a new trial." *Baker v. State*, 204 Kan. 607, 611, 464 P.2d 212 (1970). Appellate courts thus will not entertain an evidentiary objection on appeal if the objection does not meet the requirements of K.S.A. 60-404. See *State v. Richmond*, 289 Kan. 419, 429, 212 P.3d 165 (2009).

As we will explain more when discussing each aspect of Alfaro-Valleda's appellate argument related to Exhibit 73, the arguments presented to the district court judge gave him the opportunity to consider the objections and to rule on them. We thus conclude Alfaro-Valleda's objection to the evidentiary ruling sufficed to preserve his appellate arguments for our review.

10

### 1.2 *Exhibit 73 relevant*

In considering Alfaro-Valleda's arguments, we apply a multistep analysis. We first consider whether the photograph is relevant. *State v. Morris*, 311 Kan. 483, 492, 463 P.3d 417 (2020).

As to the question of preservation, the judge's questions to the prosecutor about the purpose for using Exhibit 73 reveal the judge understood the need to consider relevance when ruling on Alfaro-Valleda's objection and, indeed, the judge repeatedly and specifically found the photograph relevant. We thus conclude Alfaro-Valleda preserved the issue.

We next consider whether the photograph was relevant—that is, whether it has a reasonable tendency to prove a material fact. *Morris*, 311 Kan. at 492. Courts split this test into two questions: (1) Is the evidence material; and (2) is it probative? See *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). A material fact is one that has some real bearing on the decision in the case. *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014). Materiality presents a question of law that appellate courts consider de novo without deferring to the district court judge. *Miller*, 308 Kan. at 1166. Evidence is probative if it has any tendency to prove any material fact. 308 Kan. at 1167. We examine a probative determination for an abuse of discretion by the judge. 308 Kan. at 1166. A district court judge commits an abuse of discretion by (1) adopting a ruling no reasonable person would make, (2) making a legal error or reaching a legal conclusion not supported by factual findings, or (3) reaching a factual finding not supported by substantial competent evidence. *State v. James*, 309 Kan. 1280, 1305-06, 443 P.3d 1063 (2019).

As to materiality, "photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death." *State v. Verge*, 272 Kan. 501, 515, 34 P.3d 449 (2001); see *State v. Dupree*, 304 Kan. 43, 64, 371 P.3d 862 (2006) (quoting *Verge,* 272 Kan. at 515). Alfaro-Valleda focuses on the second of these two options—support of the testimony of a pathologist about cause of death. While the judge at first explored this option, he eventually found the photograph relevant even though no pathologist testified. But Alfaro-Valleda argues error occurs in admitting the autopsy photograph for any reason other than support of the pathologist's testimony. For support, Alfaro-Valleda cites *State v. Rodriguez,* 295 Kan. 1146, 1157, 289 P.3d 85 (2012). Granted, *Rodriguez* and many other decisions discussing gruesome photographs tie a photograph's relevance to its support of some aspect of a pathologist's or medical examiner's testimony. E.g., 295 Kan. at 1157 ("Although [the photographs] may sometimes be gruesome, autopsy photographs that assist a pathologist in explaining the cause of death are relevant and admissible."). But none of the decisions hold a pathologist's or medical examiner's testimony is a prerequisite to the admission of an autopsy photograph. This case offers an example of materiality despite no testimony from a pathologist about cause of death.

The judge's colloquy with the attorneys and the crime scene investigator's answer to the single question posed about Exhibit 73 revealed two alternative rationales leading to the judge's holding. First, the photograph corroborated the crime scene investigator's testimony about seeing a bullet removed from the decedent's head during the autopsy. This testimony verified a step in the chain of custody of the physical evidence that became important because other evidence showed that the retrieved bullet was of a type that could have been fired from the magazine Herrera bought for Alfaro-Valleda. Second, as the prosecutor had first argued, the photograph displaying the bullet retrieved from

12

Arita-Hurtado's head also tends to prove the fact and manner of death, both of which were material facts in the trial even if not controverted. See *State v. Seba*, 305 Kan. 185, 213-14, 380 P.3d 209 (2016); *Dupree*, 304 Kan. at 64.

Evidence tying Alfaro-Valleda to the cause of death was both material and probative. Upon our de novo review, we hold the evidence was material. And we conclude the district court judge did not abuse his discretion in weighing the probative nature of the photograph.

### 1.3 *Exhibit 73 not unduly prejudicial*

That brings us to the second step of our review. At this step, the judge may still exclude relevant evidence if the risk of undue prejudice outweighs the probative value of the evidence. *Morris*, 311 Kan. at 492. A district court errs by admitting gruesome photographs that serve only to inflame the jury. *State v. Love*, 305 Kan. 716, 721, 387 P.3d 820 (2017); *Rodriguez*, 295 Kan. at 1157. Alfaro-Valleda contends the district court judge unreasonably disregarded or minimized the gruesome nature of Exhibit 73, and he argues the State sought its admission for an inflammatory purpose.

As to whether Alfaro-Valleda preserved this objection, his appellate counsel contends his trial counsel's repeated use of the single word "gruesome" was shorthand for an objection that the photograph's potential for prejudice outweighed its probative value. The district court judge appears to have understood that to be the argument because the judge addressed that balancing in making his ruling. We thus conclude the issue was preserved.

13

When an appellant questions the district court judge's weighing of probative value and prejudice before us, we review the judge's ruling for abuse of discretion. Alfaro-Valleda, the party arguing prejudice, bears the burden of proving an abuse of discretion. *Morris*, 311 Kan. at 492. Alfaro-Valleda does not argue that the district court judge made an error of law or fact in conducting this weighing. We thus examine his argument to see whether the district court judge's weighing was arbitrary, fanciful, or unreasonable. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

We conclude the district court judge reasonably decided the photograph was not unduly prejudicial. The judge's conclusion reflects Kansas law about the admissibility of autopsy photographs. As this court has stated, "[g]ruesome crimes result in gruesome photographs." *State v. Green*, 274 Kan. 145, 148, 48 P.3d 1276 (2002). As a result, judges regularly admit gruesome photographs in murder cases—often in greater numbers and reflecting more gruesome images than that shown in Exhibit 73. And we regularly hold no abuse of discretion occurred in admitting them. E.g., *Morris*, 311 Kan. at 494-96 (detailing many photographs showing decedent, his injuries, decomposition, and animal damage to the decedent's body); *Seba*, 305 Kan. at 213-15 (holding no abuse of discretion in district court's admission of photograph showing trajectory of bullet through decedent's brain and photographs of decedent's deceased fetus).

Alfaro-Valleda attempts to distinguish these cases by arguing the photograph here served no purpose other than to prejudice the jury because he did not contest the cause of death. He also argues that more prejudice results when the coroner does not testify because the jury can distinguish between the alterations to the body caused by the criminal act and those caused by the autopsy procedure if the coroner testifies. As to the first of those points, we recently rejected a similar argument because "[t]he prosecution ha[s] the burden to prove beyond a reasonable doubt all elements of the crime charged,

14

including the fact and manner of the death and its violent nature, even if those limited aspects of the case were undisputed." *State v. Randle*, 311 Kan. 468, 479, 462 P.3d 624 (2020). Alfaro-Valleda does not persuade us that a different result is warranted here where the district court judge admitted only one photograph over Alfaro-Valleda's objection. As to the second point, the crime scene investigator's testimony, though very brief, made clear he shot Exhibit 73 during an autopsy and that it depicted where the bullet was retrieved. These explanations alleviated any potential confusion and explained the purpose of showing the photograph. That purpose was not to inflame the jurors' passions but to supply relevant information about the investigation and the evidence from which they could infer Alfaro-Valleda's involvement as the shooter.

Finally, Alfaro-Valleda argues that Exhibit 73 was unnecessary because other photographs show Arita-Hurtado's wounds. Alfaro-Valleda's trial counsel raised, and the judge considered, this objection during the pretrial hearing. Then, during the trial, Alfaro-Valleda's counsel broadly incorporated his earlier objections. The State noted that Exhibit 73 was the only photograph showing where the pathologist removed the bullet from Arita-Hurtado's head. The record bolsters the State's argument. Thus, Exhibit 73 was relevant even if it may have overlapped with other photographs that showed the entry points of the bullets and the extent of damage they caused.

In summary, Exhibit 73 was relevant, and it was not unduly prejudicial. It was a moment in a three-day trial; the photograph was introduced and admitted through one question and one two-sentence answer. The district court did not abuse its discretion in admitting the photograph.

15

ISSUE 2: *Harmless prosecutorial error*

For his second issue, Alfaro-Valleda points to seven times during the State's closing argument when the prosecutor pointed the jury to circumstantial evidence and suggested to the jury that from that evidence "we know" something is a fact—such as that Alfaro-Valleda shot Arita-Hurtado or that Alfaro-Valleda followed Arita-Hurtado. Alfaro-Valleda argues the prosecutor effectively asked the jury to accept several conclusions as known facts, even though he contested the conclusions. And he argues that our decisions hold a prosecutor commits error by saying conclusions based on inferences are known or true. E.g., *State v. King*, 308 Kan. 16, 30-35, 417 P.3d 1073 (2018).

The State responds by asking us to overrule *King* and similar cases in which we cautioned prosecutors to avoid using the phrase "we know" and found error when they did not heed the warning. It alternatively argues the prosecutor's statements would not violate that caselaw. Finally, it argues that any error by the prosecutor did not affect the jury's verdict.

We analyze these arguments by discussing our caselaw warning against the practice of using the phrase of "we know" and addressing the State's arguments about why we should overrule those cases. Because we reject that invitation, we next discuss whether each of the seven instances was error. Then, because we find the prosecutor erred, we examine whether the error affected the outcome of the verdict.

16

## 2.1 *Legal framework for analyzing prosecutorial error*

Looking first at the legal framework, we apply a two-step analysis when evaluating claims of prosecutorial error. First, we ask whether the prosecutor's comments fall outside the wide latitude afforded prosecutors. We allow prosecutors to pursue the State's case and try to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. Second, if we decide prosecutorial error occurred, the State must show beyond a reasonable doubt that any error did not affect the outcome of the trial—that is, there is no reasonable possibility the error contributed to the verdict. *King*, 308 Kan. at 30.

As to the first step, when considered in the context of the arguments raised by Alfaro-Valleda, a prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility. In 2016, we cautioned against the use of "I think" or words of similar import because those words convey a prosecutor's opinion or personal view, and the prosecutor's view is irrelevant to the jury's task. We suggested prosecutors should replace such language with "less potentially subjectively loaded phrase[s]," such as "the evidence shows" or "I submit." *State v. Charles*, 304 Kan. 158, 175, 372 P.3d 1109 (2016). Two years later, we concluded a prosecutor errs by using the phrase "we know" during closing argument in the context of making inferences for the jury because that use conveyed the prosecutor's opinion, which is irrelevant. See *King*, 308 Kan. at 34. We warned that this holding applies "even if the inferences being drawn were reasonable." See *King*, 308 Kan. at 31, 34-35. But use of a "we know" statement is not prosecutorial error when the evidence being discussed is not controverted. See 308 Kan. at 34-35.

17

We recently reaffirmed *King* in *State v. Douglas*, 313 Kan. 704, 490 P.3d 34 (2021). Reviewing the prosecutor's closing argument to the jury, we noted he used "we know" three times in the context of discussing uncontroverted evidence, and we held he did not commit error by doing so. But we held the prosecutor committed error by saying "we know" when inferring, based on evidence, that the defendant fired the fatal shot. We reiterated the general rule that an inference, even a reasonable one, captures the prosecutor's thought process or opinion and is not an uncontroverted fact. See 313 Kan. at 714-15.

Likewise, we applied *King*'s rationale to another challenged statement in *State v. Blevins*, 313 Kan. 413, 485 P.3d 1175 (2021). There, the prosecutor stated, "'There's no question that there was a plan that was created . . . ,'" and then recited facts the State argued supported the inference. 313 Kan. at 431. We concluded the "statement veered over the line of fair comment" because the factual premises that followed supported the inference a plan existed, not that there was *no question* on the point. 313 Kan. at 432. We relied on the *King* distinction between uncontroverted facts and statements drawing inferences for the jury in concluding the statement was prosecutorial error.

2.2   King *reaffirmed*

Conceding that at least one of the seven times the prosecutor used "we know" when drawing an inference violates the line drawn in *King*, the State argues we should overrule *King*'s holding. Yet, "'[w]e do not overrule precedent lightly and must give full consideration to the doctrine of stare decisis.'" *City of Kingman v. Ary*, 312 Kan. 408, 416, 475 P.3d 1240 (2020). We take this position because application of stare decisis promotes stability and continuity, assuring each branch of government—including the judicial branch—is bound by law. 312 Kan. at 416. While stare decisis is not a "rigid

inevitability," we generally follow our precedent "unless clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." 312 Kan. at 416. The State did not expressly address principles of stare decisis in its briefing on this issue, but its briefing implies that the *King* rule on prosecutorial error was originally erroneous.

One way in which the State constructs this argument is by examining how *King* expanded the holding of the case on which it relied, *State v. Corbett*, 281 Kan. 294, 315-16, 130 P.3d 1179 (2006). In *King*, the court quoted a passage from *Corbett* in which the court found that the prosecutor used the phrase "we know" only when talking about uncontroverted evidence. *King*, 308 Kan. at 31 (quoting *Corbett*, 281 Kan. at 315-16). Given that, the *Corbett* court held "[t]he phrase 'we know' does not indicate his personal opinion, but demonstrates that the evidence was uncontroverted. Thus, the use of the phrase 'we know' under these facts is not improper. " *Corbett*, 281 Kan. at 315-16. The State argues nothing in *Corbett* prohibited the use of the phrase "we know" when drawing an inference.

Granted, *Corbett* did not explicitly address use of "we know" in the context of an inference. Yet *King*'s holding is a logical extension of *Corbett*'s discussion of the issue. The *Corbett* court explained that a prosecutor crosses the line of permissible argument by offering the prosecutor's opinion about the evidence because such statements offer "unsworn, unchecked testimony, not commentary on the evidence of the case." 281 Kan. at 315. A prosecutor inferring from evidence and adding that "we know" the inference is valid crosses the line by giving the prosecutor's opinion about the strength and meaning of the evidence. Although phrased as "we know" instead of "I know," the "we" includes the prosecutor. But it is the jury's job, not the prosecutor's, to draw those conclusions.

19

The State also argues this court has taken a view different from most other courts. These courts, the State argues, view "we know" statements as a rhetorical device that conveys reasonable people would draw the same inference as the one offered by the prosecutor given the evidence. In this context, these courts conclude the prosecutor does not offer the prosecutor's opinion, vouch for the evidence, or imply that the State knows something the jury does not. See, e.g., *Crutchfield v. United States*, 779 A.2d 307, 320 (D.C. 2001). The State also cites two United States Supreme Court cases for the propositions that an appellate court must consider counsel's arguments in context and courts should not infer an ambiguous remark was intended to have its most damaging meaning. *Boyde v. California,* 494 U.S. 370, 385, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990); *Donnelly v. DeChristoforo,* 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974).

Certainly, other courts have chosen a different approach to a prosecutor's use of "we know," although these courts often discuss the potential problems that can arise. E.g., *State v. Acuna Valenzuela*, 245 Ariz. 197, 218, 426 P.3d 1176 (2018) (noting "these comments from the prosecutor come close to the line" and cautioning "prosecutors to refrain from using 'we know' and similar phrases to suggest that their argument bears the imprimatur of the state"). This court has adopted a stronger approach aimed at thwarting potential prejudicial conduct because these statements can—and in the context of several Kansas cases have—amounted to a prosecutor stating the prosecutor's opinion. Simply because other courts decided not to do the same does not mean *King*'s rule about a prosecutor's use of "we know" statements was originally mistaken.

Finally, the State argues *King* and its progeny deviates from our standard prosecutorial error approach of examining a prosecutor's statement in context. We disagree. *King* itself recognizes the importance of examining context. *King*, 308 Kan. at

33 ("Rather than isolating a prosecutor's comment and analyzing it in the abstract, appellate courts question the comment in the context that it was made."). And the *King* holding that the use of "we know" does not automatically create error shows that a court must look to context when deciding whether a prosecutor errs.

We also note from a stare decisis standpoint that the cases cited by the State predate this court's decision in *King* and the more recent decision in *Douglas*. The cited cases do not therefore reveal changing conditions that warrant overturning precedent. And while Kansas may view the use of "we know" in the cases before it differently from other jurisdictions, we are not persuaded that our original rule was wrong or is no longer sound. We thus decline the State's request that we abandon our holding in *King*.

### 2.3 *Error under* King

We now consider each "we know" statement to determine whether the statement constitutes prosecutorial error.

Alfaro-Valleda's first claim of error involves the prosecutor's statement, "The party ended for Mike when the defendant shot him dead in the parking lot at 2920 Oakland Avenue. And how do we know that it was the defendant?"

Yet, Alfaro-Valleda controverted the shooter's identity. As outlined above, the case against Alfaro-Valleda involved circumstantial evidence and his statement to police. We thus do not know it was Alfaro-Valleda who shot Arita-Hurtado. Instead, concluding that he was the shooter requires inferring from the evidence presented.

21

Next, Alfaro-Valleda points to this statement: "And how do we know that it was the defendant? Well, when [Arita-Hurtado] left [his girlfriend's] house, he called [her]." The State then outlined the call, in which Arita-Hurtado reported he was being followed by a truck. The testimony that Arita-Hurtado perceived himself to be followed does nothing to establish Alfaro-Valleda killed Arita-Hurtado or even that Alfaro-Valleda was the person driving the truck Arita-Hurtado saw following him. It at best provides a link in the chain of inferences that may support Alfaro-Valleda's conviction.

The next "we know" statement similarly requires inferences be drawn to link Alfaro-Valleda to the murder. He said: "And how do we know it was the defendant that was following [Arita-Hurtado]? Well, take [the video], and you see that blue Honda CRV." The State established a dark Honda SUV, possibly a CRV, was following Arita-Hurtado shortly before he was killed. And the State established Alfaro-Valleda registered and drove a blue Honda CRV. But the video did not show that the Honda following Arita-Hurtado was the same one registered to Alfaro-Valleda or that Alfaro-Valleda was driving the Honda following Arita-Hurtado. Those conclusions require inferences.

The State also asked the jury to draw inferences linking the gun used to kill Arita-Hurtado to Alfaro-Valleda: "And we know the defendant has a gun because [Arita-Hurtado] was shot multiple times." The fact that Arita-Hurtado was shot does not establish that Alfaro-Valleda had a gun, or that Alfaro-Valleda owned or used the gun that killed Arita-Hurtado.

Next, the State argued Alfaro-Valleda's gun had a magazine containing the type of ammunition used to kill Arita-Hurtado: "And what does that magazine contain? .380 ammo. And how do we know that? Because .380 ammo was what was surrounding the body of [Arita-Hurtado]." This conclusion requires inferences, including: Alfaro-Valleda

22

still owned the gun; the purchased magazine was used to hold .380 ammunition even though it could hold another caliber; and Alfaro-Valleda used the magazine with the .380 ammunition to kill Arita-Hurtado.

Alfaro-Valleda then calls this court's attention to the State's claim, "How do we know that it was his conscious objective to [shoot Arita-Hurtado]? He put multiple bullets inside of [Arita-Hurtado's] body." It may be reasonable to infer that someone who shot a person multiple times held the conscious objective to kill, but the conclusion still asks the jury to draw an inference. But other evidence, including Alfaro-Valleda's insistence he did not know Arita-Hurtado was dating his son's mother, might lead a juror to reject any inference that person was Alfaro-Valleda.

Finally, on rebuttal, the State argued, "This is beyond coincidence, and this is personal. How do we know it's personal?" The State then argues stippling observed near Arita-Hurtado's eye indicates the shooter fired the gun from close range. Proximity to the victim may support an inference that a killing is personal, but it does not prove that it was.

We thus conclude the prosecutor made all the "we know" statements in the context of asking the jury to make an inference about matters that Alfaro-Valleda contested.

Even so, the State argues against the conclusion that any of these "we know" statements were error, contending the "we know" phrases asserted nothing because they were mere verbal tics and the prosecutor embedded most in a question. We disagree that these points lead to a different outcome.

23

An example of a similar phrase being used in a manner that we considered to be a tic can be found in *Charles*, 304 Kan. 158. There, we examined claims of error arising from the prosecutor's repeated use of "I think" during closing arguments. We concluded that "on repeated reading in context, we are convinced that the 'I thinks' littering the transcript in this case are mere verbal tics—transitions and time fillers akin to 'um' or 'uh.' As such, we hold that they were not outside the wide latitude given the prosecutor." 304 Kan. at 175. Here, however, the "we knows" were not transitions or fillers. Each was key to the meaning of the sentence. And in *Charles* we cautioned against future use of "I think" during closing. In contrast, this court in *King* had admonished prosecutors to avoid using "I/we know" about a year before the closing argument during Alfaro-Valleda's trial.

We also reject the State's attempt to distinguish *King* and its progeny because the prosecutor couched the use of "we know" in a question. This court has ruled a prosecutor's question to the jury can be error. See *State v. Robinson*, 303 Kan. 11, 259-61, 363 P.3d 875 (2015), *disapproved of on other grounds in State v. Cheever,* 306 Kan. 760, 800, 402 P.3d 1126 (2017). We recognized a question can invoke the same meaning as a declarative sentence and invite the jury to reach a certain conclusion. In *Robinson*, the question invited the jury to speculate about events not supported by the evidence. 303 Kan. at 260-61. Here, each "we know" question invited the jury to understand that the conclusion was fact, something to be known, rather than an inference the jury must draw on its own or reject after weighing the evidence and arguments. Phrasing the request as a question rather than a declaration does not change the nature of the communication, which was an expression of the prosecutor's opinion. And offering that opinion is error under Kansas precedent. See *King*, 308 Kan. at 31, 34-35.

24

2.4 *Each statement individually harmless*

Each of the "we know" statements that Alfaro-Valleda criticizes constitutes prosecutorial error under our precedent. But any error resulting from any one of these "we know " statements was individually harmless. A prosecutor's error during closing argument may be harmless if the State shows beyond a reasonable doubt that any error did not affect the outcome of the trial—that is, there is no reasonable possibility the error contributed to the verdict. *King*, 308 Kan. at 30. We conclude the State met its burden.

The prosecutor followed up each "we know" statement with an explanation of the evidence he argued supported it. And the court instructed the jury that arguments and remarks of counsel are intended to help understand the evidence, but counsel's arguments and remarks are not themselves evidence. Much as in *Blevins*, 313 Kan. at 432-33, the prosecutor overplayed his hand by using "we know" when inferences were required. But it appears unlikely any individual instance affected the verdict given the evidence against Alfaro-Valleda, including his own statement, and the district court's instruction on arguments of counsel. We believe beyond a reasonable doubt that the verdict was not affected by any individual "we know" statement.

2.5 *Cumulative impact of the "we know" statement*

Although we find each instance of prosecutorial error outlined above was individually harmless, we now consider the cumulative impact of these statements. In this context, the State has the burden to convince us beyond a reasonable doubt that the cumulative impact of the errors did not affect the verdict. Cf. *Blevins*, 313 Kan. at 433-34.

25

Alfaro-Valleda argues the evidence of identity here was "hardly voluminous," and therefore there is a reasonable probability that the jury would have formed reasonable doubt and reached a different verdict without the State's comments on identity and motive combined with its characterization of the distance of the shooting as showing it was personal. We disagree.

The most persuasive evidence at trial was likely Alfaro-Valleda's second statement. Although in it he did not explicitly say he killed Arita-Hurtado, he implies he did. He shared that he knew police had caught him and he had gained nothing with his actions. He offered a reason for his actions—he did it for the mother of his son. He offered that she told him she would be with another man and that he should prove his love for her. He also said he was sorry for what he did, and he recognized he would not see his son. The circumstantial evidence presented at trial established Alfaro-Valleda had means and opportunity to kill Arita-Hurtado. His own words explained why he did so.

Another factor weighs toward finding the prosecutor's errors did not affect the verdict. The district court judge instructed the jury:

> "Instruction No. 3. Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded."

We presume juries follow the instructions. *State v. Hillard*, 313 Kan. 830, 845, 491 P.3d 1223 (2021).

In sum, between Alfaro-Valleda's statement, the evidence presented, and the jury instruction to disregard counsel's arguments not supported by the evidence, we find the prosecutor's errors here cumulatively harmless. Cf. *Blevins*, 313 Kan. at 436. The prosecutor asked the jury to draw reasonable inferences made compelling by the evidence. Cf. *King*, 308 Kan. at 35. We are convinced beyond a reasonable doubt that the verdict was not affected by the cumulative effect of the seven "we know" statements.

ISSUE 3: *No error in not instructing on limited use of out-of-court statements*

The next issue arises because the district court judge allowed two witnesses to testify about statements made by other people who did not testify during the trial. Several analytical questions arise any time evidence includes a statement made by a witness who will not testify in court. One of the threshold considerations is: Was the statement hearsay? K.S.A. 2020 Supp. 60-460 instructs that "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except" under circumstances set out in the rest of the statute.

We must consider whether the two statements met this definition. To determine this, we must consider the nature of the two statements. In the first one, the State asked Arita-Hurtado's sister what Arita-Hurtado said when he left the party about what he intended to do. The district court judge allowed her to testify about Arita-Hurtado's out-of-court statement, holding the State did not offer it for the truth of the statement—that is, to represent the truth of what he intended to do—but to show his state of mind. Arita-Hurtado's sister then testified that he said he would take his girlfriend home and then would come back and continue to celebrate. The second statement came in the context of the testimony of a witness who said he had received a text message from an unidentified

27

person who asked him to move Alfaro-Valleda's vehicle. The State asked the witness what the text said, and Alfaro-Valleda's attorney objected on hearsay grounds. The district court judge again admitted the evidence, holding the text was not hearsay because the statement was not being admitted for the truth of the text but only to explain the witness' actions. The witness then said the text asked him to move the vehicle because of concern about needing to secure the tools in it.

Alfaro-Valleda's attorney did not ask the judge to instruct the jury—either when admitting the evidence or when giving closing instructions—about the limited purpose of the two statements. So the judge did not inform the jury that it should consider the first statement only to the extent it revealed Arita-Hurtado's state of mind or the second only as an explanation of the witness' actions. Despite the issue of an instruction not being discussed at trial, on appeal Alfaro-Valleda argues the district court judge erred by not instructing the jury on the limited purposes for which it could consider the evidence.

### 3.1 *Framework for reviewing claim*

We apply a three-step inquiry for claims of jury instruction error. First, we consider whether Alfaro-Valleda preserved the issue. Second, we ask whether the instruction was legally and factually appropriate, using unlimited review of the entire record and viewing the evidence in the light most favorable to the requesting party. Third, if error is found, we consider whether the error is reversible. *Douglas*, 313 Kan. at 709. Usually, if a party does not preserve the instruction error by requesting the instruction or objecting to the wording of a given instruction, we review for clear error. K.S.A. 2020 Supp. 22-3414(3); see *Douglas*, 313 Kan. at 710. Appellate courts applying the clear error standard reverse a verdict only if an error occurred and the court is firmly convinced the jury would have reached a different verdict if the instruction error had not occurred.

28

At this point, Alfaro-Valleda, as the party claiming a clear error, has the burden to show the necessary prejudice. See K.S.A. 2020 Supp. 22-3414(3); *State v. McLinn*, 307 Kan. 307, 318, 409 P.3d 1 (2018).

Alfaro-Valleda concedes he did not request a jury instruction informing the jury that the two out-of-court statements could not be used to prove the truth of the matter asserted. That typically means the clear error standard applies. Here, however, the parties' arguments raise a question about the application of the clear error standard when a judge admits evidence for a limited purpose. That question arises because of the wording of K.S.A. 60-406.

K.S.A. 60-406 states:  "When relevant evidence is admissible as to one party or for one purpose and is inadmissible as to other parties or for another purpose, the judge upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." Here, the State asked the district court judge to limit the scope of the evidence to, in one instance, apply only to Arita-Hurtado's state of mind and, in the other instance, to explain the witness' actions. Given that request, was the judge required to sua sponte instruct the jury? And does the statute displace the clear error standard? We conclude the answer to both questions is, "No."

We read the words "upon request" in K.S.A. 60-406 to apply to both (1) restricting the proper scope of the evidence and (2) instructing the jury. Our caselaw suggests a district court may appropriately give a limiting instruction sua sponte. But that caselaw does not require a judge to do so without a request from counsel, except if K.S.A. 60-455 applies. See *State v. Race*, 293 Kan. 69, 75-77, 259 P.3d 707 (2011); see also *State v. Kidwell*, 199 Kan. 752, 755, 434 P.2d 316 (1967) ("When evidence is introduced for a limited purpose the trial court *should* explain the limitation to the jury and limit its

29

application for that purpose." [Emphasis added.]). But see *State v. Sims*, 308 Kan. 1488, 1505, 431 P.3d 288 (2018) (limiting jury instruction required when evidence admitted under K.S.A. 2020 Supp. 60-455). K.S.A. 2020 Supp. 60-455, which deals with evidence of other civil wrongs or crimes, does not apply here.

Outside that context, we see no statutory or other reason to limit counsel from making the strategic decision to not request an instruction that might bring added attention to the evidence. We thus hold that limiting evidence under K.S.A. 60-404 and K.S.A. 60-406 does not automatically lead to a district court judge's duty to instruct the jury on the limitation.

From that conclusion, it follows that K.S.A. 60-406 does not displace the clear error standard in K.S.A. 2020 Supp. 22-3414(3). Through that statute the Legislature has imposed a clear error review for jury instruction issues unless a party objected to "the giving or failure to give an instruction" and lodged the objection "before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection." This statute reinforces our reading of K.S.A. 60-406 to not require a judge to sua sponte give a limiting jury instruction. And we hold that, even if the circumstances implicate K.S.A. 60-406, an appellate court can reverse a verdict for the failure to give an instruction only if that failure was clear error, unless a party objected to the failure before the jury retired to consider its verdict.

3.2 *No clear error*

We next apply the traditional steps of clear error analysis to a claim of jury instruction error. In doing so, we presume the giving of an instruction here would have been legally and factually proper. But we conclude the district court judge did not

30

commit clear error by not giving the instruction because we are not convinced the jury would have reached a different result had the judge given an instruction. See *State v. Nunez*, 313 Kan. 540, 55, 486 P.3d 606 (2021). The evidence about Arita's-Hurtado's state of mind when leaving the New Year's Eve party and the reasons given for having someone move Alfaro-Valleda's truck had de minimis meaning and were unlikely to sway a jury.

Alfaro-Valleda claims Arita-Hurtado's statements about his state of mind were used to support the State's theory that Arita-Hurtado was innocently transporting his girlfriend and her son home and was "not engaged in any other behavior that could have precipitated the incident that resulted in his death." But the jury heard other evidence that Arita-Hurtado followed through on the plans reflected in his statement. Arita-Hurtado's girlfriend testified he drove her home. Video along the route between the girlfriend's and the sister's residences showed a car consistent with Arita-Hurtado's driving back toward his sister's apartment. And the timeline left little room for a detour—either geographically or in purpose. Given this corroborating evidence, an instruction limiting the purpose for which the jury could consider the sister's testimony was unlikely to change the jury's verdict.

Nor would an instruction directing the jury not to consider the truth of the reason given for moving Alfaro-Valleda's vehicle have influenced the verdict. The person who moved Alfaro-Valleda's vehicle testified he did so at the request of an unknown person who pulled the vehicle out of a garage and handed over the keys, suggesting that person had authority to make the request. Cross-examination clarified that the request to move the car did not come from Alfaro-Valleda. And, if the jury accepted as true the statement that the purpose of the move was to protect the tools in the vehicle, the statement likely supported Alfaro-Valleda's innocence because it offered an innocent explanation rather

31

than leaving the inference the purpose was to hide evidence of guilt. Any damage caused by not limiting why the jury could consider any text message would not have affected the verdict.

The evidence complained of here was de minimis given the evidence presented at trial. As we have already noted, Alfaro-Valleda's second statement, although obscure, strongly implied he had shot Arita-Hurtado. Alfaro-Valleda has not carried his burden to firmly convince us that a limiting instruction would have affected the verdict.

ISSUE 4: *No error in listing guilty first on a verdict form*

Next, Alfaro-Valleda claims error occurred when the district court listed the jury's choice of finding him guilty before listing the option of not guilty on the verdict form. Alfaro-Valleda asked the district court judge to reverse the order of the two choices, but the judge denied the request. We hold the judge did not err.

We recently considered a similar argument in *State v. Fraire*, 312 Kan. 786, 481 P.3d 129 (2021). There, as here, defense counsel objected to placing the guilty option before the not guilty option, and the district court denied the objection. We applied the same standard of review as we apply when reviewing jury instructions, concluding the verdict form "is part of the packet sent with the jury which includes the instructions and assists the jury in reaching its verdict." 312 Kan. at 795 (quoting *Unruh v. Purina Mills*, LLC, 289 Kan. 1185, 1197-98, 221 P.3d 1130 [2009]). Using that standard, we rejected the claim of error. We concluded the defendant had made no showing that "the order in which the verdict form presents the options has any bearing on the likelihood of a jury reaching one verdict or the other." 312 Kan. at 796. We also observed that "[r]ealistically, jurors are probably not closely examining the verdict form before they begin their

32

deliberations, and it is unrealistic to suggest they change their collective conclusion when the foreperson starts to fill out the form." 312 Kan. at 796.

While the State and Alfaro-Valleda cite dueling social science studies, Alfaro-Valleda gives us no persuasive *legal* reason to depart from *Fraire*. Here, as in *Fraire*, the district court gave a presumption of innocence instruction:

> "Instruction No. 9: The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced that he is guilty.

> "The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

We are not persuaded that a jury would ignore this instruction or be swayed by the order in which options appear on a verdict form. Under our precedent, as reaffirmed in *Fraire*, the district court did not err in placing guilty first on the verdict form. And Alfaro-Valleda does not persuade us to overrule that precedent. See *City of Kingman*, 312 Kan. at 416 (discussing stare decisis principles).

ISSUE 5: *Cumulative error harmless*

Cumulative trial errors, considered collectively, may require reversal when the errors, under the totality of the circumstances, substantially prejudiced a defendant and denied a fair trial. When we review a cumulative error claim, several well-established standards guide us. First, we examine the errors in context, considering whether the

33

district court judge addressed any error; the nature and number of errors; the relationship, if any, between the errors; and the strength of the evidence. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). Second, we apply the constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), if, as here, any of the errors are constitutional. Finally, under the *Chapman* test, the party benefitting from the error, here the State, "must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome." *Thomas*, 311 Kan. at 914.

We have decided the prosecutor erred several times during the closing arguments. And we presumed the district court erred by not giving an instruction limiting the scope of the jury's consideration of two out-of-court statements. The prosecutor's errors during closing argument implicated Alfaro-Valleda's right to a fair trial, which means we will apply the *Chapman* constitutional harmless error standard.

Even under that heightened standard, we are not persuaded to reverse the jury's verdict. As we have already discussed, we see no reasonable possibility the seven "we know" statements of the prosecutor contributed to the verdict here, and any error was harmless beyond a reasonable doubt. We are not persuaded the calculus changes when we add into the mix the judge's failure to instruct the jury about the limited use of the two out-of-court statements. The statement about why Alfaro-Valleda's vehicle was moved had negligible probative value. The statements about Arita-Hurtado's state of mind overlapped with evidence introduced at trial in other ways. And allowing the two hearsay statements without instructing the jury about the limited reason for admitting the statement had little to no impact on the prosecutorial errors or their impact.

We are convinced the jury would have drawn the same inferences and reached the same verdict without the prosecutorial error and with a jury instruction limiting the purpose for which the jury considered the two out-of-court statements.

Affirmed.