IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,328

STATE OF KANSAS,
*Appellee*,

v.

DEVONTE DOMINIQUE WASH,
*Appellant.*

SYLLABUS BY THE COURT

1.

When a defendant raises a prosecutorial error issue, an appellate court examines whether the act complained of falls outside the wide latitude afforded a prosecutor to conduct the State's case in a way that does not offend the defendant's right to a fair trial. If it concludes the prosecutor erred, the appellate court decides whether that error prejudiced the defendant's right to a fair trial.

2.

An order in limine prevents the introduction of inadmissible evidence, prejudicial statements, or improper questions by counsel. While such orders are typically provisional and subject to modification, once granted, they prohibit discussion of excluded evidence before a jury.

3.

A prosecutor errs by violating a court order in limine when discussing the excluded subject matter in a jury's presence, even if done indirectly.

1

4.

Although a contemporaneous objection is generally not required to preserve prosecutorial error claims for appellate review, K.S.A. 60-404 necessitates one when the claim essentially relates to an evidentiary issue—such as a prosecutor's question or a witness' answer.

5.

If a prosecutor uses words like "we know" when drawing inferences, even reasonable ones, for a jury rather than simply recounting the uncontroverted evidence, the prosecutor errs.

6.

An appellate court evaluates prejudice from prosecutorial error using the constitutional harmlessness test under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Chapman* places a heavy burden on the State to demonstrate no reasonable possibility exists that any identified error contributed to the verdict.

7.

To protect a defendant's Fifth Amendment privilege against self-incrimination, statements made during custodial interviews are admissible only if the State shows it employed procedural safeguards, i.e., *Miranda* warnings.

8.

A defendant's "not-me-but-him" argument that suggests a third party may have committed the crime requires proof linking the third party to the crime. Without that additional evidence, such claims have little probative value and can be excluded at trial.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Oral argument held January 29, 2025. Opinion filed June 27, 2025. Reversed and remanded.

*Laura Stratton*, of Capital Appeals and Conflicts Office, argued the cause and was on the brief for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Devonte Dominique Wash appeals his capital murder conviction for the deaths of his girlfriend Ashley Harlan and her unborn child. He argues multiple prosecutorial errors, including some the State begrudgingly concedes, were not harmless, given the limited circumstantial evidence against him. We agree with Wash, reverse his conviction, and remand the case to the district court for further proceedings.

The State's fatal missteps fall into two categories. First, the prosecutor repeatedly discussed firearm ballistics evidence in front of the jury, even though that evidence was excluded by the district court's order in limine. A prosecutor errs by violating such an order, even if the excluded subject matter is presented indirectly through the prosecutor's questioning. See K.S.A. 2024 Supp. 60-243(c) (inadmissible evidence cannot be discussed in front of jury); *State v. Gleason*, 277 Kan. 624, 640-41, 88 P.3d 218 (2004) (holding the prosecutor violated the order in limine by indirectly eliciting testimony about it). Second, during closing arguments, the prosecutor asserted everyone "knew" evidence disputed by the defendant was undisputed—a practice we have condemned. See *State v. Alfaro-Valleda*, 314 Kan. 526, 538-41, 502 P.3d 66 (2022); *State v. King*, 308 Kan. 16, 34-35, 417 P.3d 1073 (2018); *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006).

Once identified, prosecutorial error is harmless only if the State shows there is no reasonable possibility the error contributed to the verdict. *State v. Chandler*, 307 Kan. 657, 679, 414 P.3d 713 (2018). Here, the State fails to carry that burden because its circumstantial evidence contained meaningful gaps the prosecutor attempted to close with unfair tactics that cannot be dismissed as "minor aberrations in a prolonged trial." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940). The State failed to uphold its responsibility in safeguarding Wash's right to a fair trial even while advocating against him. See *Chandler*, 307 Kan. at 658 ("In a criminal prosecution, the State's obligation is to ensure its case is vigorously, but properly, championed to bring about a just conviction—not merely a win.").

FACTUAL AND PROCEDURAL BACKGROUND

About 4 p.m. on January 30, 2018, Wash called 911 to report he found Harlan shot and bleeding from her face. Police arrived to find her body lying almost directly in the doorway of her Olathe townhouse. They saw dried blood around her face but no signs of a disturbance or forced entry. A torn, plastic baggie was clenched in her hand, with the top portion still intact, while the bottom half appeared to have been taken.

Outside the townhouse, Detective Carson Spegal spoke with Wash before asking him to come to the police station. Wash agreed, and Spegal drove him there. While at the station, Wash remained cooperative, allowed investigators to download data from his cell phone, voluntarily removed his clothes for inspection, and permitted a body exam.

Wash described his activities on the day before, January 29. He lived with his daughter in his grandmother's house in Kansas City, Kansas. That morning, he took his daughter to daycare and went to work in Kansas City, Missouri. He had a phone conversation with Harlan, ending around 6:15 p.m. so she could get ready for church.

4

They texted each other, "I love you." He spent the rest of the evening at home, giving his daughter a bath and putting her to bed, before falling asleep watching TV. He woke up around 4 a.m. to go to the bathroom and saw a missed call from Harlan at 9:07 p.m. He did not return it and went back to bed.

The next day, Wash dropped off his daughter and went to work. He left around 2:30 p.m., concerned Harlan had not returned his texts or calls. He picked up his daughter from daycare, went home to grab clothes to spend the night, and headed to Harlan's with his daughter. When he got there, the door was unlocked. He found Harlan on the floor with blood on her face. He picked up his daughter and saw the kitchen door blinds moving. He went through that door to check the backyard but saw nothing. He then walked out to place his daughter back in his vehicle and called 911.

Wash told Detective Spegal about Harlan's previous partners, Carl Patillo and Mark Theis. Wash confirmed he did not own a gun and said he had never owned one. Spegal ended the interview after midnight on January 31 and took Wash home.

Meanwhile, crime scene investigators searched Harlan's townhouse and discovered a fired 9mm Luger SIG cartridge casing by a couch near the body. No others were found, even though she was shot three times. Investigators never recovered a firearm. They also discovered marijuana in glass jars and drug paraphernalia, including plastic baggies, like the one in Harlan's hand. Police inferred she died around 9:11 p.m. on January 29, using data extracted from her phone showing no movement after that time and an SOS power down occurring around then.

Officers interviewed Patillo, who testified at trial. He had known Harlan since 2013, and though their friendship eventually turned romantic, it was "very spotty." In the summer of 2017, Patillo and Harlan resumed their romantic relationship, while he was

5

dating Lacy Attebery. Harlan later told him she had been seeing Wash, was pregnant with Wash's child, and wanted to build a family with him. At the time of Harlan's death, he was living in Spring Hill with Attebery. He testified he could not recall details about January 29 but believed he and Attebery went to dinner and returned around midnight. He gave investigators his cellphone and a mouth swab for DNA analysis. He was not a gun owner but inherited one from his father in December 2017, which he later pawned.

At trial, Attebery corroborated Patillo's alibi. She noted he appeared shocked when he learned of Harlan's murder, suffered a panic attack, and went to the hospital after police left their apartment. Investigators studied Patillo's cell phone records and concluded the phone was in or around Spring Hill on January 29 and 30.

Police also contacted Theis after receiving multiple reports about his involvement with Harlan, including allegations he introduced her to drugs and groomed her for sex trafficking. Some said Harlan expressed significant fear of him. At trial, Theis testified he lived in Olathe with Nicole Gillihan and their adult son when Harlan died. He had suffered from sciatic nerve issues since May 2017, had difficulty moving, and was mostly confined to their basement. He did not own a car and could not drive due to back pain.

Theis first met Harlan when she was 18 or 19 and he was in his late 40s. She moved in with him around 2013. They used methamphetamine and had a sexual relationship. He lost contact with her in 2014 and did not know her whereabouts. Theis, a convicted felon, did not own a gun but said his son Colin had several. He refused to provide his cell phone but gave his DNA for testing.

Gillihan corroborated Theis' testimony. She said she often brought him meals because of his limited mobility, and that he sometimes had to use water bottles to urinate because the basement lacked a bathroom. Either she or Colin took Theis to medical

appointments. Theis underwent three surgeries beginning in mid-2018. Gillihan knew Harlan and acknowledged the sex trafficking and abuse allegations but denied such things happened.

As part of the investigation, Detective Chad Ramey verified Theis' physical condition by obtaining medical records stating he had a degenerative disc and spine condition and needed a wheelchair to enter medical facilities. Harlan's phone records suggested she did not have contact with Theis after 2014. Ramey also contacted Colin, who owned firearms mainly for his work as a fugitive recovery agent. He had a Taurus PT111 G2 9mm that he traded in October 2017 for a "Smith & Wesson SB 9mm" he carried in January 2018. Ramey located the Taurus and sent it to the lab. Colin knew Harlan through his father and last saw her about five years earlier.

Ramey testified he initially had about 15 suspects for Harlan's murder. The investigation involved more than 200 interviews and 50 officers. Three months elapsed before Wash's arrest, much longer than usual.

In March 2018, the investigative focus shifted when Wash's financial records, showing two transactions at a U-Haul store in Kansas City, Kansas, on January 31, 2018, raised suspicion because it had not been previously mentioned in interviews with Wash, his friends, family, or coworkers. The 10-foot truck Wash rented displayed a "graphics package" on the side featuring a cell phone image with "Kansas City" written on it. Investigators analyzed surveillance footage from intersections around Harlan's townhouse to check if any U-Haul trucks passed by. One traveling westbound through the Santa Fe and Ridgeview intersection on January 29, at 8:40 p.m., was the first sighting with a similar graphics package.

That truck continued west, but no other cameras captured it beyond a reflected image seen on a window at Chang's Liquor Store near Santa Fe and Church, heading towards the street leading into Harlan's neighborhood. A second sighting from this window reflection occurred at 9:30 p.m., with a U-Haul traveling eastbound through the same intersection, heading toward I-35, in the opposite direction from Harlan's house.

At trial, Detective Ramey testified he reviewed this footage and claimed the "same U-Haul" traveled east on Santa Fe, heading toward the interstate, although he conceded the images on the store glass were "blurry." Detective Chanel Evans, who also reviewed the footage, admitted he could not definitely say the second U-Haul was the same as the first, but commented there were no others with similar graphics during this time. Also in the relevant timeframe, two other 10-foot trucks with the "Kansas City" graphics were rented. Both renters told Ramey their trucks had not been in Olathe.

Ramey also noted Wash's U-Haul contract logged 68 miles on the truck between 3:56 p.m. on January 29 and 10:42 p.m. on January 30. He found this significant because Wash would not have had time to drive that far based on his self-described activities. Ramey recreated Wash's claimed route and concluded the U-Haul would have driven about 57.6 miles—leaving 9.4 miles unaccounted for. Ramey said the round trip from Harlan's to Wash's house was around 47 miles.

Investigators spoke twice to "E.J." Williams, Wash's friend. In February 2018, Williams did not share much with them at Wash's request, providing only basic information. In April, he told officers he had driven Wash to the U-Haul store. At trial, he testified he had known Wash since childhood, and that they maintained a close friendship until the investigation began. In 2018, Wash asked for Williams' help renting a U-Haul. Williams recounted that Wash came to his house on January 29, and they drove together to the U-Haul location. Afterward, Williams followed him to a spot near Wash's

8

grandmother's house and dropped off the U-Haul. Wash told Williams he was moving some things for his grandmother's friend who had passed away.

Williams also mentioned discharging a firearm in his backyard with Wash during a New Year's Eve party. The police executed a search warrant at Williams' house and recovered fired shell casings. Police discovered Wash bought a Taurus PT-111, a semiautomatic double-stack 9mm pistol, in December 2017, along with Sig Sauer V-Crown hollow-point ammunition. This was about six weeks before Harlan's death. Shell casing photos from the crime scene and Williams' backyard were admitted into evidence.

Investigators contacted a director of security at Honeywell Federal Manufacturing and Technologies, where Wash worked. At trial, the director testified he reviewed surveillance video and compared it with timecard logs showing Wash clocked in at 7:30 a.m. and clocked out at 4 p.m. on both January 29 and 30. But the badge logs and video showed Wash left at 2:30 p.m. on January 29 and 2:29 p.m. on January 30.

In April 2018, Detective Spegal confronted Wash with discrepancies between the evidence gathered and his earlier statements. Wash did not try to reconcile those inconsistencies and was arrested. The State charged him with capital murder under K.S.A. 21-5401(a)(6) ("Capital murder is the . . . intentional and premeditated killing of more than one person as a part of the same act or transaction."). A medical examiner testified Harlan suffered three gunshot wounds to the head and that her 21-week-old fetus died from intrauterine fetal demise after the mother's death. See K.S.A. 21-5419(c) ("As used in K.S.A. 21-5401 . . . 'person' and 'human being' also mean an unborn child.").

After a three-week trial, the jury found Wash guilty of capital murder. The district court sentenced him to life in prison without the possibility of parole under K.S.A. 21-6617(a).

9

In this direct appeal, Wash asserts: (1) the prosecutor erroneously mentioned excluded firearm ballistics evidence repeatedly; (2) the prosecutor erroneously conveyed his opinion by stating "we know" facts that were actually disputed; (3) the district court erroneously admitted Wash's initial statements to police before he was given *Miranda* rights, including his false statements about not owning a gun; (4) the court erroneously excluded evidence showing Harlan's fear of her ex-boyfriend, Theis; and (5) the cumulative effect from these errors denied Wash a fair trial.

Jurisdiction is proper. See K.S.A. 22-3601(b)(3) (life imprisonment), (b)(4) (off-grid crime); K.S.A. 21-5401(c) (capital murder is an off-grid person felony).

THE PROSECUTION DISCUSSED EXCLUDED EVIDENCE

The district court barred the State's expert witness from testifying that the single, recovered bullet casing from the crime scene matched or was fired from the same gun as the casings discovered in Williams' backyard. But despite that ruling, in the jury's presence, the prosecutor asked Wash's grandmother, who knew nothing about any firearm, bullets, or bullet casings, "[W]ere you aware that the shell casings at the crime scene . . . had *the same markings* as the one at [Williams'] house . . . . Did you know that?" (Emphasis added.) Similarly, he asked Wash in the jury's presence to confirm the cartridges "*had the same markings on them.*" (Emphasis added.) And even after the court sustained the defense's objection to that question, the prosecutor repeated the inquiry about "the same markings" while cross-examining Wash and abruptly stopped without getting a response, after the defense lodged yet another objection.

This "same markings" theme continued during closing arguments. Wash notes the prosecutor told the jury, "You don't have to be a scientist to know that those [markings]

10

came *from the same firearm*." (Emphasis added.) And after another court admonishment, the prosecutor even commented about the defense's objections, saying, "*They don't want to talk about that. They want to argue about it*, and that's because the evidence is compelling to you to show . . . Wash is the one who fired both of those weapons at both of those locations*, using the same firearm* he bought at Cabela's." (Emphases added.) Wash claims these are just a few of the occurrences showing the State violated the court's pretrial order to secure his conviction. The State argues the order in limine only applied to what the expert could say—not the prosecutor's assertion of the same thing as fact when questioning witnesses or in closing.

We agree with Wash and reject the State's sleight-of-hand about the prosecutor's persistent violations of the court's unambiguous order. See *State v. Miller*, 308 Kan. 1119, 1163, 427 P.3d 907 (2018) ("The State's argument that [its] question about 'pornography' did not violate the limine order prohibiting mention of 'commercial pornography' did not persuade the trial court. Nor are we persuaded by that hair-splitting. To borrow the defense's descriptor, the argument 'is, at best, sophistry.'"). A prosecutor errs by violating a court order in limine, even if the path taken might appear indirect. See *Gleason*, 277 Kan. at 640-41.

*Additional facts*

Williams hosted a New Year's Eve party with family and friends, including Wash, on December 31, 2017, about a month before Harlan's death. At Wash's suggestion, he and Williams went outside to shoot a gun in the backyard, and Williams' wife recorded the event on her phone. The video showing Williams and Wash returning inside after shooting a gun was played for the jury.

11

Investigators found six cartridge casings scattered in the backyard. The prosecution wanted to claim through expert testimony from Jason Butell, a Johnson County Crime Lab technician, that a bullet casing from the crime scene matched one fired in Williams' backyard, though the gun itself was never recovered. Wash said he sold it before police asked about it.

*The court's order*

Before trial, Wash argued the State's proffered evidence failed the *Daubert* test for reliability and should be excluded. See *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The district court agreed in part and restricted what could be offered at trial. It ruled the expert could testify about similarities between the cartridge case's toolmarks but could not claim the same gun made those marks or express any level of certainty about a match.

The court's order followed *United States v. Davis*, No. 4:18-cr-00011, 2019 WL 4306971 (W.D. Va. 2019) (unpublished opinion) (noting a National Research Council's report questioning reliability and scientific validity of identifying firearm and toolmarks by the subjective process of comparing individual characteristics), and relied on K.S.A. 2021 Supp. 60-456(b) (expert testimony). The court explained it was hesitant to broadly rule on firearm-toolmark examination, noting the limited evidence—the absence of the gun and only two cartridge casings to compare. It mentioned recent studies that raised doubts about the methodology behind this testimony, highlighting error rates and possibilities for subjectivity. The court observed these concerns led many other courts to limit, rather than exclude, such testimony, so it imposed similar restrictions in Wash's case.

The court ordered that the expert could not offer opinions that:  (1) the cartridge cases were discharged from the same firearm; (2) one cartridge case matched another; (3) the toolmarks' signature can trace a cartridge case to a single firearm; (4) state any level of certainty these two cartridge cases matched; or (5) the same firearm discharged both the bullet from the crime scene and the one from Williams' backyard. It stated:

> "So the court is going to make this ruling as to what Mr. Butell and any other firearm-toolmark examiner called to testify . . . may say and . . . may not say.

> "So, first, I'm going to rule that Mr. Butell and any other firearm-toolmark examiner called to testify by either party may say or may provide testimony explaining their examination procedure, *describe any similar characteristics* in the toolmarks observed on examined cartridge cases, and based on those observations, *render an opinion as to whether toolmarks on certain cartridge cases, there are consistent marks with each other. . . .*

> "*So an expert may not opine that certain cartridge cases were fired by the same gun. May not opine that a cartridge case is a, quote, match, end of quote, to other cartridge cases or firearms, and may not opine that toolmarks reflect a quote, signature, end of quote, permitting the conclusion that certain cartridge cases may be traced to a single firearm or may not express confidence in their opinions to any specific level of certainty . . . .*" (Emphases added.)

The court repeated this prohibition at trial. Its order effectively meant neither party could present evidence through expert opinion that the two cartridges were fired by the same gun. The State did not appeal this ruling.

The prosecution seemingly understood the court's order. In its opening statement, it told the jury Butell would testify he examined various casings "from other suspect guns" and that "there was only one that could not be excluded as having *similar*

*characteristics* of the casing, the one casing found at the crime scene, and that was DeVonte Wash's casing that he shot off on New Year's Eve." (Emphasis added.) Later in opening, the prosecutor explained the testimony from the firearm mark examiner would differ from "ratios that the odds of this DNA being consistent with this person are one in a million or whatever." He then said: "Compare that to what you will hear from the firearm mark examiner *because you're not going to hear any testimony about how many firearms can leave similar marks. You're not going to hear any testimony about what firearms left those marks. You're not going to hear any of that.*" (Emphasis added.)

During trial, the State presented Butell's testimony, along with his PowerPoint slides. In direct examination, Butell explained key forensic concepts, defining "individual characteristics" as marks from a tool surface's imperfections or irregularities, "subclass characteristics" as features arising from flaws during the manufacturing process, and "class characteristics" as general, measurable features that categorize firearms and tools.

Butell testified he examined three firearms: a High Point, once owned by Patillo, Williams' Glock 19, and a Taurus PT111 G2, formerly owned by Colin Theis. He compared cartridge cases from the Taurus and one from the crime scene and testified they shared similar characteristics but had no microscopic similarities. He also compared the crime scene cartridge casing to the ones from Williams' backyard finding similar individual characteristics and class characteristics. He said the ammunitions were the same type: Sig brand, 9mm Luger caliber. But during cross-examination, Butell confirmed that not having access to the gun limited his ability to create additional samples for testing.

*Mentioning excluded evidence as established fact*

Wash argues the State violated the court's order repeatedly while questioning two witnesses during trial and when making closing arguments to the jury.

The first claimed error occurred during the State's direct examination of Wash's grandmother, which came before Butell testified. She knew nothing about any firearm, bullets, or bullet casings, but despite this lack of foundational knowledge, the prosecutor stated as fact that the shell casings "had the same markings" and asked her to confirm it. The transcript reflects this exchange: "[W]ere you aware that the shell casings at the crime scene . . . *had the same markings* as the one at [Williams'] house . . . ? Did you know that?" (Emphasis added.) She answered, "No."

The defense delayed objecting to this until after the prosecutor finished the grandmother's direct examination, which was not long afterward (about 34 lines later in the transcript). In response, the State argued the order in limine only restricted the expert's testimony and it was fairly asking a witness about an inference from the evidence. The defense countered that it "just doesn't make much sense" to allow another person to "say that these things are the same" when that is the "whole point of expert testimony." The district court acknowledged the objection but noted it was not contemporaneous. The court said it would address the issue in the jury instructions.

Wash claims the second and third instances happened when the State cross-examined him when he testified in his own defense. These occurred after Butell's testimony. For the second instance, the prosecutor again stated as fact that the shell cases "had the same markings on them" and wanted Wash to confirm that fact. The prosecutor asked, "You saw the characteristics of the one that you fired in the backyard and the one at the crime scene; right? You saw those, right, those pictures?" Wash responded, "I saw

15

the markings of the shell casing." The prosecutor then declared, "And you saw that *they had the same markings on them*." (Emphasis added.) The defense objected immediately, which the court sustained. The prosecutor corrected himself, saying, "It had *similar* characteristics and markings." (Emphasis added.)

The third incident occurred just after the second. The prosecutor asked if Wash "heard the testimony of Mr. Butell," and then said again, "[Y]ou saw the *same markings*." (Emphasis added.) The defense again objected. But the prosecutor abruptly concluded his cross-examination without waiting for a ruling or an answer. The court then clarified for the jury that it "should understand that the testimony from Mr. Butell is they were similar characteristics, not [the] same."

Turning to the State's closing, Wash alleges more instances when the prosecutor continued the "same gun" theme. For the first, the prosecutor argued, "[J]ust like in DNA you, as jurors, can infer from the evidence that Items 220 and 221 from [Williams'] house and the item at the crime scene, Item 6, *came from the same gun*." (Emphasis added.)

The prosecutor returned to the topic later in closing, stating:

> "*So you get the same markings.* . . . [Y]ou as jurors can decide for yourselves whether those look like they came from the same gun. Just like you can decide for yourselves the ones taken in the back yard from EJ Williams' house and the crime scene matched. You can make that decision yourself. You can just look at it. *You don't have to be a scientist to know that those came from the same firearm.*" (Emphases added.)

The defense objected, and the court admonished the jury, "[T]he science does not allow you to reach the decision that they came from the same firearm because the same firearm was not recovered, but you can take the testimony of the expert that they have

16

similar characteristics, that's what the evidence is." But right after that, the prosecution remarked on the defense's objection, stating, "*They don't want to talk about that. They want to argue about it*, and that's because the evidence is compelling to you to show . . . *Wash is the one who fired both of those weapons at both of those locations, using the same firearm he bought at Cabela's*." (Emphases added.)

*Standard of review*

When a defendant raises an issue of prosecutorial error, an appellate court first determines whether the act complained of falls outside a prosecutor's wide latitude to conduct the State's case in any way that does not offend the defendant's right to a fair trial. If it finds error, the appellate court decides whether the error prejudiced the defendant's fair trial right. *State v. Slusser*, 317 Kan. 174, 185, 527 P.3d 565 (2023); *State v. Galloway*, 268 Kan. 682, 693, 1 P.3d 844 (2000) (two-part test evaluates alleged violations of a motion in limine by reviewing error and prejudice).

*Discussion*

An order in limine aims to ensure a fair and impartial trial by preventing the introduction of inadmissible evidence, prejudicial statements, or improper questions by counsel. *State v. Shadden*, 290 Kan. 803, 803, 235 P.3d 436 (2010). While such orders are typically provisional and subject to modification as the trial progresses, once granted, they prohibit discussion of the excluded evidence before a jury to prevent undue prejudice. K.S.A. 60-243(c) (inadmissible evidence cannot be discussed in front of a jury); *State v. Crume*, 271 Kan. 87, Syl. ¶ 5, 22 P.3d 1057 (2001) ("When a motion in limine is taken under advisement by the court, the matter should not be raised except in the absence of the jury. Care must be exercised during trial because prejudice may be

17

implanted in the minds of the jurors by attorneys asking unanswered questions or by witnesses making statements which are subsequently stricken.").

A prosecutor errs by violating, even indirectly, a court order in limine. See *Gleason*, 277 Kan. at 640-41. While a contemporaneous objection is generally not needed to preserve a prosecutorial error claim for appellate review, one is required under K.S.A. 60-404 when that claim essentially relates to an evidentiary issue—such as a prosecutor's question or witness response. *Slusser*, 317 Kan. at 184; *State v. Huggins*, 319 Kan. 358, 372, 554 P.3d 661 (2024) (holding that, even when a limine order is in place, a party must still timely and specifically object to preserve any issues under K.S.A. 60-404).

As described, the district court issued a pretrial order delineating what evidence could and could not be mentioned. It repeated its order during trial. Wash identifies seven instances in which he claims the State exposed the jury to the excluded evidence. The first, involving the grandmother's questioning, has an issue preservation problem, so we discuss that first.

*Issue preservation with the grandmother's direct examination*

The State argues the defense objection to the prosecutor's question to the grandmother was untimely by waiting until he concluded direct examination, making appellate review for error inappropriate. The district court agreed the objection was not contemporaneous. We concur.

We must examine whether Wash preserved this claim, applying unlimited review, because an appellate court considers evidentiary based claims of prosecutorial error only if there is a timely and specific objection. *State v. Scheetz*, 318 Kan. 48, 58, 541 P.3d 79 (2024). The "timely" requirement is a crucial procedural safeguard that enables the

18

district court to avoid potential reversal or retrial. *State v. Ballou*, 310 Kan. 591, Syl. ¶ 6, 448 P.3d 479 (2019).

We hold Wash did not preserve this prosecutorial error complaint with a timely objection and will not include it as a ground for reversal. See K.S.A. 60-404 ("A verdict . . . shall not be set aside . . . by reason of [unpreserved evidentiary error]."); *State v. Sean*, 306 Kan. 963, 982, 399 P.3d 168 (2017). That said, we leave open for another case whether similar tactics in questioning a witness can escape evaluation as an indicator of fault when considering "prosecutorial misconduct." See *State v. Sherman*, 305 Kan. 88, 114, 378 P.3d 1060 (2016) ("Prosecutorial acts properly categorized as 'prosecutorial misconduct' are erroneous acts done with a level of culpability that exceeds mere negligence.").

### Other mentions of excluded evidence

The State argues the prosecution did not technically violate the court's order by asking if Wash "saw the same markings on the casings." But this essentially asked an untrained witness to give an opinion about firearm ballistics, inviting the jury to accept an unsupported, factual premise. See K.S.A. 60-456 (providing a lay witness cannot give opinions "based on scientific, technical or other specialized knowledge"). The district court precisely prohibited counsel from asking Butell and "any other firearm-toolmark examiner," to make such a conclusion. Still, the State skirted that order by claiming it did not apply to lay witnesses, signaling a win-at-all-cost perspective. See *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (criticizing the prosecution for allowing its "desire to win" to overshadow the State's duty to ensure the defendant's right to a fair trial); *Crume*, 271 Kan. at 101 ("[T]he prosecutor must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of

19

fairness. Put another way, the prosecutor's mission is not so much to convict as it is to achieve a just result.").

But the court's order did not—and could not—mean witnesses like Wash or counsel could offer opinions about firearm markings that experts were prohibited from giving. K.S.A. 60-456 (preventing lay witnesses from giving expert testimony); *State v. Blevins*, 313 Kan. 413, 434, 485 P.3d 1175 (2021) ("Prosecutors are not witnesses— expert or otherwise."). The prosecutor erred.

Turning to the prosecutor's closing arguments, the first remark ("[J]ust like in DNA you, as jurors, can infer from the evidence that Items 220 and 221 from [Williams'] house and the item at the crime scene, Item 6, came from the same gun.") is a close call because at least it recognizes jurors must infer those conclusions from the evidence. Similarly, the third comment ("You don't have to be a scientist to know that those came from the same firearm.") might be excusable in another context, but the trial court determined it was erroneous by sustaining the objection to it.

The second and fourth remarks, though, are not close calls. In the second ("So you get the same markings."), the prosecutor erred by mentioning the prohibited evidence as established fact. See *State v. Lowery*, 308 Kan. 1183, 1205, 427 P.3d 865 (2018) (holding "portion of the closing argument was erroneous because it violated the trial court's order in limine"). And the fourth aside ("They don't want to talk about that. They want to argue about it, and that's because the evidence is compelling to you to show . . . Wash is the one who fired both of those weapons at both of those locations, using the same firearm he bought at Cabela's."), shortly after the court disallowed the third remark, is an editorial comment on the district court's evidentiary ruling, a practice condemned by well-established caselaw. "Why any prosecutor would . . . mention such rulings in closing argument to bolster its case before the jury is beyond any good answer. When the law is

20

so clear we cannot understand why such errors occur." *State v. Louis*, 305 Kan. 453, 465, 384 P.3d 1 (2016).

We hold the prosecution defied the court's order during trial. The State knew the court did not want any discussion of whether the cartridge cases were fired by the same gun or could be traced to a single firearm. And the State showed it understood these limits by constraining its opening arguments yet brazenly crossed that line multiple times later.

Our finding of error means the State must prove no reasonable possibility exists that its error contributed to the verdict. See *Slusser*, 317 Kan. at 185. This is a difficult burden for the State in any appeal; we will wait to assess the prejudicial impact until we decide if other prosecutorial errors occurred.

PROSECUTORIAL ERROR CONVEYING OPINION ABOUT DISPUTED EVIDENCE

We now turn to Wash's claims the prosecutor improperly gave personal opinions on disputed evidence during closing arguments. Our long-standing view is that a prosecutor crosses the line by offering an opinion about the evidence. Such statements, we have held, provide "unsworn, unchecked testimony, not commentary on the evidence of the case." *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006). Included within this prohibition are instances when a prosecutor uses words like "we know" when drawing inferences for the jury rather than simply recounting uncontroverted evidence, even if it is a reasonable inference. *State v. Alfaro-Valleda*, 314 Kan. 526, 541, 502 P.3d 66 (2022) ("This court has adopted a stronger approach aimed at thwarting potential prejudicial conduct because these statements can—and in the context of several Kansas cases have—amounted to a prosecutor stating the prosecutor's opinion."); *State v. King*, 308 Kan. 16, 33, 417 P.3d 1073 (2018) ("Rather than isolating a prosecutor's comment

and analyzing it in the abstract, appellate courts question the comment in the context that it was made.").

In *Alfaro-Valleda*, which was decided well before Wash's trial, the court set down an easily understood rule that permits a statement like "we know" when the evidence is uncontroverted. The *Alfaro-Valleda* court held:

> "[A] prosecutor's wide latitude does not extend to announcing the prosecutor's opinion on issues for the jury, including the defendant's guilt or innocence or witness credibility. . . . [A] prosecutor errs by using the phrase 'we know' during closing argument in the context of making inferences for the jury because that use conveyed the prosecutor's opinion, which is irrelevant. . . . [T]his holding applies 'even if the inferences being drawn were reasonable.' But use of a 'we know' statement is not prosecutorial error when the evidence being discussed is not controverted. [Citations omitted.]" 314 Kan. at 538.

Prosecutors have known for some time to avoid statements of personal certainty when discussing disputed evidence. See *King*, 308 Kan. at 31.

Wash contends the prosecution made nine improper remarks during closing statements by declaring "we know" to say that disputed facts were really undisputed to indicate Wash's guilt and to vouch for a witness' credibility. The State acknowledges some mistakes but otherwise maintains the prosecutor properly referenced uncontested evidence or was offhandedly transitioning from one subject to another, not asserting the prosecutor's opinion. We agree with Wash on many of his error claims.

*Standard of review*

The same error-and-prejudice analysis controls here. *Alfaro-Valleda*, 314 Kan. at 538 (applying a two-step analysis when evaluating prosecutorial error claims).

22

*Discussion*

For readability, we itemize each claim by Wash.

(1) *Wash killed Harlan.*

The prosecutor told the jury:

> "So let's talk in conclusion about *what we do know. We know* that after he rented that U-Haul, after *he killed Ashley Harlan* he came back the next day, and he indicated that he was consistently concerned about Ashley, so concerned that he went and dropped the U-Haul off, not checking on her, but anyway, he eventually showed up at her house." (Emphases added.)

The State makes no effort to explain how this statement is supported by uncontroverted evidence, and all agree no evidence conclusively proved Wash's culpability. Instead, the prosecution used the undisputed facts that Wash rented a U-Haul and visited Harlan's residence the next day to improperly state the highly disputed inference that he killed Harlan as a fact. See *State v. Douglas*, 313 Kan. 704, 714-15, 490 P.3d 34 (2021) (holding the prosecution erroneously said "we know" the defendant murdered the victims when that conclusion was only inferred).

While Wash did rent a U-Haul, the State only presented surveillance footage from reflections in Chang's Liquor Store's windows of unidentified U-Haul trucks with unknown drivers during the relevant timeframe. But no additional evidence shows how often similar U-Haul trucks appeared on the camera, so it is nearly impossible to weigh the importance of a truck being seen on Chang's camera around the time when police believe Harlan died. Without this context, it is too speculative to infer these reflections

23

were connected to the crime, let alone communicate certainty about whether Wash committed the crime. We hold the prosecution erred.

(2) *What Wash did the evening Harlan died*

Recall that Detective Ramey also testified Wash's rented U-Haul mileage was inconsistent with his claimed timeline. Relying on this, the prosecutor said Wash's actions with the truck were undisputed, declaring:

> "So let's talk about mileage. It's uncontroverted that 68 miles were put on that U-Haul. We know that and *we also know exactly what the defendant did the 29th and 30th in his travels through video surveillance*, whether it be the neighbors, Kansas City, Kansas, Honeywell checkouts, ins and outs at the day care, we've got him locked down as to what he was doing on that day and then you couple it with the cell tower information, what that does is that vice starts to show that only one person and one person only was responsible for the death of Ashley Harlan and her baby, and that's the DeVonte' Wash.

> . . . .

> ". . . We know that from the U-Haul to . . . his . . . house . . . , it's basically five miles. That's ten miles, Folks. So we got another 58 to account for. We know again that his timeline *we know exactly what he was and was not doing* based on a lot of great work by the Olathe Police Department." (Emphases added.)

But the evidence about Wash's actions was disputed. It cannot be said anyone knew "exactly" that Wash was in the truck "through video surveillance," as the prosecutor commented. The State's view that this phrasing is simply a reasonable, evidence-based argument is irrelevant because its argument requires an inference. "If a prosecutor uses the words 'we know' when drawing inferences for the jury rather than recounting uncontroverted evidence, *the prosecutor errs even if drawing a reasonable*

24

*inference.*" (Emphasis added.) *Alfaro-Valleda*, 314 Kan. 526, Syl. ¶ 2. These statements were plainly error.

(3) *Wash can lie.*

Immediately after the prosecutor commented on Wash's logged mileage and argued it was inconsistent with his timeline, he said,

> "Again, the only time period he has is from 8 p.m. to 4 a.m. when he says he was asleep, and *we know* from his statement to police and how he testified in this case, *DeVonte' Wash can look you in the eye and not tell you the truth.* He did it over and over and over again but his stories do not match the evidence in this case. They do not. The Olathe Police Department eliminated all possibilities unless he is the one driving the vehicle down and killing Ashley Harlan, 68 miles and he's only accounted for ten." (Emphases added.)

Even crediting the State's argument this merely pointed out the uncontested fact that Wash had lied to police, the prosecution did so in a way to cast doubt on his trial testimony's reliability. A prosecutor cannot bolster or attack any witness' credibility, including a defendant's, unless a case turns on which conflicting story is true. *State v. Armstrong*, 299 Kan. 405, 427, 324 P.3d 1052 (2014). While the prosecutor could discuss whether Wash's version of events was true and infer Wash could lie again, he could not use "we know" to transform this into an undisputed fact. Again, the prosecutor erred.

(4) *Wash test-fired the gun before Harlan died.*

Wash challenges several remarks by the prosecutor about test-firing the gun and premeditation. "'Premeditation means to have thought the matter over beforehand, in other words, to have formed the design or intent to kill before the act.'" *State v. Z.M.*, 319

Kan. 297, 324, 555 P.3d 190 (2024). The first remark in this category is the prosecutor's statement at closing that:

"*We know from the evidence, the credible evidence that has been provided in this case that it was done with premeditation.* You heard the testimony that not only did the individual shoot Ashley Harlan but one of the gunshot wounds occurred minutes later, and based on the fact that the individual picked up evidence afterwards all is evidence that you can consider as credible evidence that, in fact, this was done in premeditation." (Emphasis added.)

This was not an erroneous statement because the undisputed evidence shows the killer formed the intent to kill before the fatal shooting. Generally, a pause between initial and subsequent shots can provide sufficient evidence of premeditation. *State v. Dotson*, 319 Kan. 32, 39, 551 P.3d 1272 (2024). And, at trial, a forensic scientist concluded there was a period between Harlan beginning to bleed from the first gunshot and the second gunshot being fired. Wash also agreed during cross-examination that whoever killed her "wanted to make sure she was dead."

For his second claim in this category, Wash argues the prosecutor's comments—"we know at the crime scene the killer couldn't find one of the shell casings" and "[w]e know that the person had a carefully laid plan, that they executed that plan"—were erroneously based on inferences, not undisputed facts. But Wash agreed "the killer [] picked up shell casings" and that "type of person . . . had a carefully laid plan in place to try to cover their tracks" during cross-examination. These comments on *the killer's* premeditation were within the prosecutor's permissible latitude.

There is more to consider, however. The prosecutor did erroneously discuss *Wash's* premeditation based on the backyard shooting video. The prosecutor said,

26

"Watch that tape. Look at the expression on DeVonte' Wash. If you're out there having a good time on New Year's Eve, shucking it up, don't you think you're going to be smiling? He is dead stone serious when he walks in there with the gun. That is a test fire, Folks. He's testing his gun. If you look and compare him to [Williams] who is laughing and shucking around as he walks in, you see that the difference between the two and the purpose of that firearm being fired that night. So we know that that is entirely untrue on multiple, multiple occasions.

. . . .

"We also know that the defendant bought that firearm 40 days before Ashley was killed. *We know he test fired it 30 days before she was killed. We know that he told [Williams], make sure you pick up the shell casings.* We know he told [Williams' wife] to get rid of the video and in the defendant's own words he got rid of the firearm." (Emphasis added.)

To start, whether Wash directed Williams to pick up the shell casings is a disputed fact, because Wash testified, although possible, he did not remember doing so. This fact may not have been vigorously contested, but it was not unchallenged. And even if it were undisputed, the prosecution, once again, erroneously stated "we know" the inference that this tape depicted a test-fire. See *Alfaro-Valleda*, 314 Kan. 526, Syl. ¶ 2. We hold it was error to comment on Wash's supposed premeditation. See *Blevins*, 313 Kan. at 431-33 (holding a prosecutor erroneously remarked, "'There's no question that there was a plan that was created,'" when the prosecutor's factual premises supported inferring a plan existed but not "there was no question on this point").

(5) *Patillo was in Spring Hill.*

In discussing Patillo, another suspect, the prosecutor said, "*We also know from his phone records that he is in Spring Hill*, especially during the time that Ashley was

27

killed." (Emphasis added.) But the only undisputed evidence is that his phone was in the area, so it must be inferred Patillo was in Spring Hill. This comment constitutes error under *Alfaro-Valleda*, and the State concedes "the preface of 'we know' should not have been used here."

(6) *Nothing ties the other suspects subject to DNA analysis to the scene.*

Wash next argues the prosecution wrongly commented "we know" nothing tied the other suspects to the scene, when a forensic scientist found animal hair on Harlan's body and Theis had several dogs and cats. At trial, the defense presented a theory that this animal hair linked Theis to the scene, so there was at least some dispute about this. But the challenged comment must be read in context. The prosecutor said,

> "Now let's talk about DNA. What does the evidence show? We have the known samples of people and there is support for inclusion of who? Ashley Harlan, DeVonte' Wash, [her grandfather]. What don't we have? We don't have any DNA evidence including Mark Theis, Carl Patillo, EJ Williams or [Wash's other girlfriend]. None either on Ashley or in the townhouse.

> "And as jurors you can find, when we talk about non-million, you can find even though that the DNA person can't say this amount of—this substance or this DNA sample is Ashley Harlan, but it's in the non-millions, you can find as jurors, as triers of fact, that, well, there is not many people on the planet so that pretty much says that that is Ashley Harlan. You can make that decision for yourself. *We also know that the compared suspects, there is nothing there that ties them to the crime scene*." (Emphasis added.)

In these comments, the prosecutor discussed uncontroverted DNA results. Swabs collected from Harlan's fingernails contained a mixture of DNA, some of which was from two male individuals. It was 24,900 times more likely that the DNA came from Wash and an unknown person than two unknown individuals. Patillo and Theis were excluded.

28

Vaginal swabs similarly showed DNA matching a male individual with traces of a third person. The analysis strongly indicated Wash was a contributor, as it was 33.6 sextillion times more likely the DNA came from Wash and an unknown person, rather than two unknown people. Patillo was ruled out as a contributor to the main sample.

No error occurred. See *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020) ("Often the line between permissible and impermissible argument is context dependent. We thus do not consider a prosecutor's statement in isolation.").

(7) *Patillo's and Colin's guns were excluded.*

Wash challenges the following prosecutorial comments:

"So there is no indication whatsoever that [Patillo] had any anger or need to kill Ashley Harlan and, in fact, the only firearm that he knew about was the one he got from his dad when his dad died and *we know from testing that that was not the firearm*.

. . . .

". . . *We also know* that the .9mm Taurus model [previously owned by Colin], the same model that the defendant bought was examined and was excluded because the individual characteristics did not match." (Emphases added.)

Wash argues the ballistics evidence was hotly contested, and, therefore, any use of "we know" to assert certainty constituted prosecutorial error. He has a point.

Butell testified Patillo's gun "could be excluded," which when read in context expressed a possibility as opposed to certainty, so the first "we know" was error. As for the second, the court excluded any evidence specifying any level of certainty regarding

29

the ballistics matching due to the highly subjective nature of the evidence, so conveying certainty with another "we know" was also error.

(8) *Williams being very credible*

Wash argues the prosecution crossed the line by vouching for the State's witness. The challenged comment is:

"When things came to light for [Williams], he decided to start providing the police with the information they asked for. He was trying to protect his best friend but decided again, as he said, You're bringing my family into this now. . . .

"So [Williams] provided [his wife's] video . . . . He provided the location of the drop-off of the U-Haul and he cooperated with police and *you can find that based on his demeanor he had no incentive to basically make things up, that [Williams] is very credible* in this case as to the version of events." (Emphasis added.)

Generally, the prosecution may not offer its opinion as to witness credibility. But it may make reasonable inferences and explain to a jury what it should consider in assessing witness credibility. *Sean*, 306 Kan. at 979. The context here shows the prosecutor did exactly that to discuss the relevant evidence from which the jury could find Williams credible. No error occurred.

(9) *Law enforcement's quality work*

It is generally improper for a prosecutor to qualitatively comment on police credibility or investigative work because it can be an "opinion to bolster law enforcement reliability as witnesses." *State v. Waldschmidt*, 318 Kan. 633, 651, 546 P.3d 716 (2024). Wash claims the prosecution improperly vouched for the credibility of the evidence produced by law enforcement in six comments.

30

The first remark complained about is:

> "As you heard, the Olathe Police Department spent thousands of hours investigating this case, running hundreds of leads to put together this investigation. They looked at every possible angle, looked at every possible suspect, reviewed data, extensive data from phones and other social media to come up with their conclusions in their investigation."

Here, the prosecutor did not comment on any officer's credibility as a witness but simply summarized Detective Ramey's testimony that the Olathe Police Department's investigation expended extensive resources, time, and effort. Ramey estimated more than 50 detectives were involved and at least 200 different interviews were conducted. This comment was not erroneous.

But the second comment that "the hard work of the Olathe Police Department" poked holes in Wash's alibi was erroneous. The context shows this remark was used not to factually discuss the police's work, but to offer an opinion because it only discussed Wash's testimony. The full statement at issue is:

> "[T]he defendant when he took the stand said, Well, I was moving something and you know, like, that TV stand down in the basement? So you're going to rent an entire U-Haul for a TV stand . . . ? I mean, look at that . . . you could have just asked [Williams], hey, let's just grab your Jeep and let's pick up the TV stand. It doesn't fit. It doesn't make sense and as triers of fact you can throw that away as evidence of what actually happened on that day.

> "But we'll talk a little bit more about his lack of memory and the U-Haul in a little bit but let's talk about his supposed alibi. He worked really hard at it. He's watched crime shows so he really made an effort to cover his tracks but the holes in the alibi have

31

sunk him and that was based on *the hard work of the Olathe Police Department* in putting together the evidence in this case.

"His timeline and that of [his grandmother] is all over the place as far as dates and times. It's clear that one thing is consistent which is [the grandmother] goes to her bedroom before he goes to bed, and I have no doubt that [she] wants to believe that he was home and that he didn't kill Ashley, and I don't blame her for that. I understand why she feels that way." (Emphasis added.)

The State rightly asserts in its brief that "context matters," but the full record shows the prosecutor expressed his own opinion. This was error.

Third, the prosecutor questioned Wash's testimony and then asserted,

"*Through the great work of the Olathe Police Department*, we basically funneled in and tightened down any options he had for explanations about what he did with that truck. Other than one. One. And that is when he said he was asleep from . . . 8 p.m. to 4 a.m., that was the time that this individual drove down to Olathe and brutally killed Ashley Harlan and her baby. That is the only time that he has available in his timeline and that is exactly what happened." (Emphasis added.)

Again, the prosecutor erroneously offered his opinion, instead of discussing the evidence. See *Sean*, 306 Kan. at 979. Rather than telling the jury how to assess the investigation's reliability, the prosecutor glowingly stated "the great work of the Olathe Police Department" explained their knowledge about Wash's incriminating actions with the truck.

32

The prosecutor's fourth and fifth comments similarly offered opinions. They are:

"[W]e know exactly what he was and was not doing based on *a lot of great work by the Olathe Police Department*." (Emphasis added.)

And,

"[W]hat happened [on] the night of January 29th of 2018 has been brought to light again by *the credible investigation* by the Olathe Police Department and the Johnson County Crime Lab and with their hard work and dedication they have proven this case beyond a reasonable doubt that this person seated right here, DeVonte' Wash, is the killer of Ashley Harlan and her unborn child." (Emphasis added.)

The sixth comment, however, fell within the prosecutor's wide latitude. He concluded his closing arguments by stating:

"Ladies and gentlemen, *this evidence was worked long and hard by the Olathe Police Department and the crime lab*. Can they erase all doubt? No, but that's not my burden to prove in this case. *The State of Kansas has to prove beyond a reasonable doubt, and in this investigation, through months of investigation, we eliminated all reasonable doubt in this case*." (Emphases added.)

Like the first comment, the "months of investigation" statement directly summarized Ramey's testimony that it took three months before any arrests were made, which was reasonably characterized as "long and hard" work. Finally, the "reasonable doubt" comment merely wrapped up the State's case and did not improperly bolster law enforcement's credibility. No error occurred here.

33

Having held multiple prosecutorial errors occurred, we must determine whether they prejudiced Wash's right to a fair trial. In evaluating prosecutorial error for prejudice, an appellate court applies the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under *Chapman*, the State bears a heavy burden to demonstrate no reasonable possibility exists that any errors contributed to the verdict. *Slusser*, 317 Kan. at 185; *Williams v. Clarke*, 40 F.3d 1529, 1541 (8th Cir. 1994) ("We recognize the heavy burden the state bears in proving that a constitutional error is harmless beyond a reasonable doubt.").

Specifically, we have already held the State erroneously mentioned excluded evidence in front of the jury by: (1) questioning whether Wash saw the shell casings with the same markings; (2) asking Wash again if he saw the same markings; (3) telling the jury "you get the same markings;" and (4) commenting on the defense's objection to the excluded-evidence references. We then identified seven additional erroneous prosecutorial remarks stating: (1) we know Wash killed Harlan; (2) we know what Wash did on January 29; (3) we know Wash can lie to the jury; (4) we know Wash test-fired a gun before the killing; (5) we know Patillo was in Spring Hill; (6) we know the other suspects' guns were not used to kill Harlan; and (7) law enforcement's quality investigatory work means its evidence should be believed.

These errors must be considered in light of the entire record, including any exonerating evidence, to determine whether the State can overcome its burden. See *State v. McBride*, 307 Kan. 60, 64, 405 P.3d 1196 (2017) (examining prejudice in the same way). We conclude Wash's conviction must be reversed.

*Additional facts*

Two days before her death, January 27, Harlan called Patillo, sounding "frantic" and "scared." She told him something "real big" had happened and she needed him to come to her townhouse immediately, because she did not want to explain it over the phone. Patillo did not go. She also called an old friend that day, crying, and her friend asked if Wash hit her or if it was something else. Again, Harlan did not want to explain over the phone and asked her to come over, but the friend could not come.

The next day, January 28, Harlan purchased cigarettes. Four used butts were found in the backyard, near shoeprints. The prints did not match Wash's, nor was he a smoker, but Patillo was. That same day, according to Wash in his initial police interview, he and Harlan had sexual intercourse, potentially explaining his DNA's presence on swabs taken from Harlan's fingernails and vagina. These swabs also contained an unidentified person's DNA.

Then, on January 29, just four minutes before investigators believe Harlan died, her phone made an outgoing call to Wash that went to voicemail. GPS data shows his phone was in Kansas City, Kansas, at that time. These events suggest Wash was not present for the crime—if he was there, why would she call him?

Before Harlan was shot, evidence suggests a violent struggle involving a bag of drugs occurred between her and the killer, in which she possibly fought back. The top of the bag was found clenched in Harlan's hand, with investigators believing the killer tore the bottom half and took it. But evidence also shows Wash was not part of this struggle. During his January 30th police interview, Wash told the detective he believed Harlan was sober, and he exhibited no detectable corresponding injuries to his torso, arms, hands, or palms, with only a single superficial abrasion on his right wrist, sustained at an

35

undetermined time. His fingernail samples did not contain DNA from Harlan, and DNA analysis of the remaining bag excluded Wash from the major DNA profile and indicated an unidentified contributor whose limited genetic information was unsuitable for comparison. Additionally, Wash's residence and car did not contain any drugs or paraphernalia, and he testified he did not use drugs.

Further, DNA testing detected semen on Harlan's lips from an unidentified person. The testing could not confirm whether Wash, Patillo, or Theis contributed to this trace. DNA was also found above Harlan's navel from two unknown individuals; Wash, Patillo, and Mark Theis were not linked as contributors to the comparable portion of the profile.

Ultimately, a Sig brand, 9mm Luger caliber, killed Harlan. The prosecution argued this matched the ammunition used by a gun Wash bought in December 2017. But that gun model was the highest selling firearm that Christmas, and the ammunition was popular and often recommended. As an additional note, despite Harlan sustaining three gunshot wounds, none of the people in almost 60 townhouses contacted by investigators reported hearing gunshots that night.

In the prosecution's version of events, the day following Harlan's death, January 30, Wash returned to the crime scene, spent nine minutes collecting all but one shell casing, and called 911. But this interpretation is complicated by the fact Wash arrived at Harlan's with his daughter, who was around three or four years old, with clothes to spend the night. He did not leave his daughter in the car but took her with him and they found the body together. His daughter's presence during this moment could imply Wash was not expecting to find a body. It is also limited by the fact the police found no traces of iron on Wash's hands, despite blood stains indicating someone moved Harlan's body.

36

And after it was confirmed that Harlan was dead, Wash was initially unresponsive, staring at the ground and said nothing. Even after law enforcement called his name multiple times and after asking if he was okay, Wash did not respond. Concerned about Wash, Detective Spegal offered to drive him to the police station, explaining he preferred Wash not drive "due to his emotional state." About two hours into the interview, Wash became emotional and cried.

The prosecution pursued the theory that Wash murdered Harlan after leaving work early on January 29 and 30. But it was not unusual for him to do so. His employer's records showed he left early and did not return multiple times in January 2018. In fact, when Harlan was moving from the Manhattan shelter she went to after leaving Theis, Wash left work without clocking out to help her. Harlan had told another shelter resident that Wash frequently ran errands during work hours without clocking out. He testified he often did so, even if he was not supposed to, or spent time reading, watching TV, or texting, because he had little to do during work.

Another key to the prosecution's theory was Wash renting a U-Haul truck to commit the crime. But he testified he did so to move in with Harlan, which is supported by evidence. He explained he needed to move some extra furniture to his grandmother's basement, although he did not tell her why because he tended to keep his relationships private. To rent the truck, U-Haul placed a hold on his card based on his estimate that he would drive 25 miles, even though the roundtrip distance between Wash's and Harlan's houses was around 47 miles. He also listed Harlan as an alternate contact on the U-Haul contract. The prosecution emphasized Wash did not park directly in front of his grandmother's house, hypothesizing he was trying to hide the truck. But Wash explained he did so to comply with no-parking signage.

To piece together where Wash drove the U-Haul, police used surveillance footage, searching for other 10-foot box trucks with similar graphics depicted on the side. The police narrowed down the possibilities from 2,200 similar trucks to 910 by focusing on trucks with graphics of two-word cities. They further limited their scope to the Kansas City metro, to identify 35 similar trucks in use in Kansas City, Kansas, Overland Park, and Olathe. But Kansas City serves as a hub for trucks coming from the surrounding region, as far as Vancouver, Canada, and Wash used a commonly rented truck at a popular time in the month to move when leases often end. And while the police testified the blurry surveillance footage showed a truck with one of these two-word city graphics, the appellate record is inconclusive. An FBI report reached a similar conclusion, stating the footage did not capture enough distinguishing features to identify the truck.

More importantly, the traffic video showing an unidentified U-Haul traveling through an intersection near Harlan's townhouse the night of her death is seriously limited by large gaps in the evidence. Footage captured the unidentified truck traveling on a nearby road but not if it turned onto her street. Nor were any cameras in place to track if the U-Haul turned in the opposite direction. And despite numerous cameras around her house, none captured it after this key intersection.

Meanwhile, Wash's grandmother testified he was home with her and his daughter the night of January 29. They had eaten dinner together and played games to celebrate his daughter's recent birthday. The State presented an exhibit showing her birthday gift. The grandmother had been watching the nine o'clock news in her bedroom, when she heard Wash giving his daughter a bath across the hall. She believed they both went to bed afterward in the room next to hers. When she woke up at 2 a.m. for work, Wash was still asleep with his daughter. She also testified her neighbor's security cameras would capture anyone leaving her home, and they did not show Wash leaving the house that night. She said she gave Wash a copy of the footage to provide to the police.

To support its theory, the prosecution also sought to demonstrate Wash was "demanding" and "controlling." It relied on an incident in which Wash grabbed Harlan's phone and threw it at her, recounted by Andrea Carter, a resident at the Manhattan shelter where Harlan had lived for several years. But Carter explained this happened after Wash discovered Harlan had been cheating on him. He subsequently broke up with her and stormed out, which Harlan later admitted she deserved. Still, the next morning, Carter unexpectedly saw Wash with Harlan "giggl[ing]."

The prosecution also pointed to text messages between Harlan and Wash, depicting a relationship plagued by distrust, accusations, and emotional turmoil, but it omitted messages, many of which were "benign" and discussed looking for an apartment. And another resident at the shelter, who often overheard their conversations on speakerphone, said disagreements sometimes led to harsher tones but the calls were generally sweet and "honeymoony."

*Discussion*

"As has often been repeated, prejudice can exist even 'in a strong case.'" *State v. Sherman*, 305 Kan. 88, 111, 378 P.3d 1060 (2016) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 [1940]). But the case against Wash was not strong. The State supported its case with two foundational pillars, the U-Haul rental and the shell casings' similarities, both of which were fraught with uncertainties. The truck rental evidence has critical gaps because the footage fails to identify the U-Haul, and there is no certainty about the truck's route, let alone any indication whether Wash was in it. The only other evidence we have about Wash's whereabouts around the time police believe Harlan was murdered is his and his grandmother's testimony he was at home. And the district court excluded some ballistics

evidence because of studies highlighting the methodology's error rates and the possibility for subjectivity.

It was the jury's responsibility to assess the evidence and reach its verdict. *State v. Brooks*, 297 Kan. 945, Syl. ¶ 2, 305 P.3d 634 (2013). The jury should have decided whether it believed Wash's version that he was asleep or the State's theory that he was in the U-Haul truck seen coming and going from Harlan's. But the prosecutor improperly intervened in that deliberative process and repeatedly imposed his opinion about witness credibility, by commenting "we know" Wash could lie and the investigation was credible. The prosecutor then bolstered this improper intervention by discussing excluded ballistics evidence in front of the jury.

In *McBride*, the court held the State did not meet its burden of showing there was no reasonable possibility the prosecutorial error—i.e., commenting on the victim's credibility—contributed to the guilty verdict. In doing so, it considered the weakness of the State's case as a factor. 307 Kan. at 72 (reversing the conviction for improper prosecutorial comments during closing argument when the State's evidence from the victim's testimony was not strong without any corroborating evidence); see also *Chandler*, 307 Kan. at 681-84 (reversing the convictions because of prosecutorial error in conjunction with the circumstantial nature of the evidence).

As in *McBride*, the State here fails to meet its burden of demonstrating there is no reasonable possibility the prosecutorial error contributed to Wash's conviction. The improper commentary on the credibility of witnesses, repeated assertions of facts unsupported by the undisputed evidence, and references to excluded evidence undermined the trial's fairness. And given that the evidence could be interpreted in either parties' favor, these improper remarks likely had a profound influence, particularly in a case that was far from overwhelming.

Reversal is required to ensure the integrity of our fair trial process.

The decision to reverse this conviction for prosecutorial error makes it unnecessary to consider Wash's additional claims of error, but we will discuss two since they are likely to be at issue should his case be retried. See *Chandler*, 307 Kan. at 684 (noting it unnecessary to consider additional alleged errors but discussing them "to avoid their repetition"); *State v. Akins*, 298 Kan. 592, 614, 315 P.3d 868 (2014) (supplying "guidance" because other raised issue could arise in a retrial); *In re Care and Treatment of Foster*, 280 Kan. 845, 857, 127 P.3d 277 (2006) ("[W]e will address the issues of the evidence and closing argument because they may arise during the retrial."); *State v. Kunellis*, 276 Kan. 461, 476, 78 P.3d 776 (2003) (same); *State v. Carter*, 270 Kan. 426, 441, 14 P.3d 1138 (2000) (same).

*The District Court Properly Admitted Wash's Statements to Police*

Wash appeals the district court's denial of his motion to suppress his statements to police outside the townhouse and at the station. He argued the statements were involuntarily made and the interviews were custodial, entitling him to his *Miranda* rights, which he preserved by timely objecting at trial. Now, he contends the district court conflated the distinct issues of whether he was entitled to his *Miranda* rights and whether he voluntarily waived those rights.

After a two-day evidentiary hearing, the district court examined his statements separately based on location, addressing both their *Miranda* implications and voluntariness independently. Cf. *State v. Mattox*, 280 Kan. 473, 483, 124 P.3d 6 (2005) (noting a person can voluntarily waive their *Miranda* rights while still making an

41

involuntary statement; indicating the voluntariness of a statement and the implications of *Miranda* are distinct issues). At trial, Wash timely objected to the statements' admission.

As the State correctly points out, Wash misinterprets both his motion to suppress and the district court's ruling. The waiver's voluntariness was never at issue; instead, the question raised by Wash and addressed by the district court was whether the statements themselves were voluntary—separate from the *Miranda* challenge. Additionally, Wash's appellate brief only raises the *Miranda* question and fails to discuss the statements' voluntariness. He focuses solely on the statements made in the interview room, neglecting those from the crime scene. And he does not dispute the district court's factual findings. Therefore, the only issue before us is whether the district court correctly concluded the police station interview did not constitute a custodial interview. See *State v. Salary*, 309 Kan. 479, 486-87, 437 P.3d 953 (2019) (issues not adequately briefed are deemed waived or abandoned).

*Standard of review*

When reviewing a district court's motion to suppress ruling, an appellate court applies a bifurcated standard of review. The district court's factual findings are reviewed for substantial competent evidence, and its legal conclusions are reviewed de novo. When facts are uncontested, the issue is a question of law over which the appellate court has unlimited review. *State v. Hillard*, 315 Kan. 732, 746, 511 P.3d 883 (2022).

*Discussion*

To protect a defendant's Fifth Amendment privilege against self-incrimination, statements made during a custodial interview are admissible only if the prosecution shows it employed procedural safeguards, i.e., *Miranda* warnings. *State v. Regelman*, 309

42

Kan. 52, 59, 430 P.3d 946 (2018); cf. K.S.A. 22-3215(4) (prosecution bears burden of proving the challenged evidence was admissible). "The *Miranda* safeguards are triggered only when an accused is (1) in custody and (2) subject to interrogation." *State v. Lewis*, 299 Kan. 828, 834, 326 P.3d 387 (2014).

A custodial interview is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); see also *State v. Guein*, 309 Kan. 1245, 1253, 444 P.3d 340 (2019) (discussing *Miranda*). The central issue is whether, under the totality of the circumstances, a reasonable person would have felt free to terminate the interrogation and leave the encounter. *Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004).

In *Guein*, 309 Kan. at 1254, we discussed how to make this decision:

"Nonexclusive factors to consider in making this determination—if an interrogation is custodial or investigative—include: (1) the interrogation's time and place; (2) its duration; (3) the number of law enforcement officers present; (4) the conduct of the officer and the person questioned; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person questioned was escorted by officers to the interrogation location or arrived under his or her own power; and (8) the interrogation's result, e.g., whether the person was allowed to leave, was detained further, or was arrested after the interrogation. No single factor outweighs another, nor do the factors bear equal weight. Every situation must be analyzed on its own particular facts."

The district court correctly reiterated the relevant law and nonexclusive eight factors. Its undisputed findings of facts recite:

"Wash called 911 at approximately 4 p.m. to report that he had arrived at his girlfriend's residence and found her dead . . . . Officer Chad Johnson arrived first on the scene and contacted Mr. Wash. . . . The body camera video shows on-the-scene conversations with Mr. Wash and that that conversation lasted approximately 50 minutes.

. . . .

"Detective Spegal explained to Mr. Wash that he would like him to go to the station so that they could talk, and Mr. Wash immediately agreed.

"The video shows that there was no hesitancy on Mr. Wash's part . . . to accompanying Detective Spegal to the police station. And rather Mr. Wash[] . . . showed complete willingness to answer any further questions.

". . . [Per the police department's policy for officers' safety concerns,] Wash was padded down, left the scene with Detective Spegal in an unmarked police vehicle, riding in the front seat next to Detective Spegal, and had no restraints, no handcuffs and, again, going voluntarily.

. . . .

". . . [The] interview occurred in an unlocked room, and the video shows that Mr. Wash was opening and closing the door twice and that Mr. Wash was in the interview room from 5:10 p.m. 'til just after midnight, 12:35 a.m. and, thus, he was there for a total of 7 hours and 25 minutes.

"During that time, Detective Spegal asked Mr. Wash at least nine times during his interview whether he wanted food, any water, whether he wanted to take a bathroom

44

break or whether he needed anything. During this time, Mr. Wash had his cellphone. He made several calls and received several calls at least five times.

"And so Mr. Wash's ability to communicate with others was never in any way blocked or interrupted by the officers.

". . . The video admitted at the hearing shows that the interview was voluntary, that it was noncustodial at the police station . . . . And at 6:14 p.m., Mr. Wash answered a phone call from his grandmother and told her he needed to discover who killed Ashley and that he was at the police station telling them everything that he knew so that they could discover who did it. And it [*sic*] the end of that conversation, Mr. Wash told his grandmother that he was about to, quote, 'help them with this case, about as much as I can,' end of quote.

"So this establishes or at least shows the Court that Mr. Wash was there voluntarily, that he was there as a witness wanting to provide information, not concerned about any restrictions on his liberty. . . .

"So then again at 6:55 p.m., Detective Spegal explained that it was helpful for Mr. Wash to be there at the station so that he could ask him questions as new information became available. . . .

"So Mr. Wash acknowledged that he continued to stay there at the police station and answer questions. And so when Detective Spegal asked him if he'd stay there and while the new information was becoming available, Mr. Wash made the statement, quote, 'for sure,' end of quote, and agreed to continue to be there.

". . . Mr. Wash consented to having his phone downloaded or cellphone downloaded, and also . . . voluntarily provided his clothes for forensic processing. He told Detective Spegal at 7:48 p.m. that he that Mr. Spegal can have all of his clothes and check it for blood. Mr. Wash reiterated that the police could have all of his clothes at 7:52 p.m. on the video when Detective Spegal was out of the room. I believe this was a situation where he was either on the phone or speaking perhaps to himself, indicating that

45

he was not in any concern about whether or not his liberty was being denied or whether he was under arrest.

. . . .

"At 10:51 [p.m.] Mr. Wash expressed frustration in waiting for the search warrant for the residence and . . . for forensic evidence to be taken from him but stated, 'I'm happy because you all are doing all that you can but damn,' showing frustration.

"So it does show Mr. Wash at times frustrated by the length of the investigation. It also showed Mr. Wash's willingness to continue to cooperate and help law enforcement determine who killed the victim in this case.

"At 11:12 p.m. the crime scene investigator arrived to execute the search warrant for Mr. Wash's clothing and to take trace evidence, and Mr. Wash left the interview room.

"[A]t the end of all of this time, Mr. Wash was not placed under arrest. Detective Spegal and Detective Ramey actually drove Mr. Wash back to his [grand]mother's residence in Olathe."

The district court then found specific facts relating to the eight nonexclusive factors:

- The first factor (time and place): The interview was at the police station, starting around 5:10 p.m. and concluding about 12:35 a.m.

- The second factor (duration): The interview lasted approximately seven and a half hours.

- The third factor (number of officers):  Detective Spegal was the only officer present, except for a crime scene investigator who entered the interview room around 11 p.m. to execute the search warrant.

- The fourth factor (interviewer's and interviewee's conduct):  Detective Spegal was low-key, polite, and at times sympathetic towards Wash. There was no intimidating behavior from Spegal to force Wash to say anything; rather, "all the statements" were made "after questioning and volunteering information on Mr. Wash's part."

- The fifth factor (restraint):  Wash was not physically restrained, the door was unlocked, and Wash "actually opened [the door] a couple of times." At one point, "he even walked out of the room."

- The sixth factor (suspect or witness):  Wash was the reporting party from the start and, at the time, the only witness the police had, making him naturally the subject of inquiry. Although Detective Spegal asked Wash at 7:39 p.m. if he had killed Harlan, Spegal later told Wash at 7:51 p.m. he did not believe Wash was involved in Harlan's death. The nature of the questions was that of a witness rather than a suspect.

- The seventh factor (transportation):  Wash was not handcuffed in the backseat of a patrol vehicle; instead, he was driven unrestrained as a passenger in the front seat of Detective Spegal's unmarked vehicle to the police station.

- The eighth factor (result):  After the interview, Wash left the police station, with detectives driving him to his home.

Based on these factual determinations, the court rejected Wash's claim that the interview was a custodial interrogation. And after the *Miranda* analysis, it addressed the separate question of the statements' voluntariness, applying the nonexclusive six-factor test. See *State v. Vonachen*, 312 Kan. 451, 464, 476 P.3d 774 (2020) (defendant's mental condition, ability to communicate with the outside world, age/intellect/background, fluency with English, interview's manner and duration, and officer's fairness in conducting the interview). The court denied the motion to suppress.

In his arguments to this court, Wash misreads his own motion and the district court ruling. The court did not combine the issues of whether he was entitled to receive the *Miranda* warnings and whether he voluntarily waived his *Miranda* rights. It properly addressed the questions separately, as raised by Wash.

Next, Wash contends that while the district court claimed to apply an objective test, it nonetheless relied on subjective elements, such as Wash's "subjective eagerness to help police," "'no hesitancy' on [his] part in going to the police station," and his "'complete willingness to answer any further questions.'" But these allegedly "subjective" findings relate to the fourth factor, which concerns the interviewee's conduct. The video evidence depicts Wash willingly assisting the police investigation, meaning the district court's factual findings are adequately supported. No error occurred.

Wash continues misreading the court's ruling in arguing it improperly relied on *State v. Walker*, 283 Kan. 587, 153 P.3d 1257 (2007) (confession's voluntariness), *State v. Ackward*, 281 Kan. 2, 128 P.3d 382 (2006) (same), *abrogated on other grounds by State v. Milo*, 315 Kan. 434, 510 P.3d 1 (2022), and *State v. Grissom*, 251 Kan. 851, 840 P.2d 1142 (1992) (same), for failing to discuss "custodial versus investigatory interrogations." The court appropriately discussed these cases, which specifically address voluntariness, to examine that very issue.

48

Finally, Wash challenges the district court's legal conclusion that the interview was not custodial. In doing so, he introduces his own facts that were not established by the court to factors one, four, five, six, and seven. Those are:

- The first factor (time and place): "It occurred in an interrogation room, deep within the police station, which required at least two key passes to access"; and "Wash generally woke up at 5 a.m. for work and went to sleep by 8 or 9 p.m."

- The fourth factor (interviewer's and interviewee's conduct): "Wash was never told he was free to leave"; at 8:56 p.m., he opened the door to the interrogation room and asked to leave; at 10:38 p.m., he told the officer he was ready to leave; and at 10:58 p.m., officers submitted an affidavit in support of a search warrant, describing Wash as "'currently detained'" at the police station.

- The fifth factor (restraint): The officer had Wash's ID card and car; there were officers outside the door; and he was not allowed to leave the room without an escort.

- The sixth factor (suspect or witness): The officer told Wash that "'you are the first person everybody points to including police'"; and "the police collected extensive physical evidence from Mr. Wash."

- The seventh factor (transportation): Wash "was dissuaded from driving himself."

Wash urges us to find a reasonable person in his position at the time would not have felt free to terminate the interview based on these other facts, which is essentially

49

asking this court to make factual findings the district court did not make. This approach is flawed. Our law is well established that an appellate court examines a district court's factual findings to determine whether they are supported by substantial competent evidence—without reweighing the evidence, assessing witness credibility, or resolving conflicts in the evidence. *Guein*, 309 Kan. at 1252.

Worse yet for Wash, after explaining its ruling, the district court asked if the parties wanted any additional findings. The defense noted certain facts were omitted from the court's analysis and requested the opportunity to submit a brief addressing those omitted facts. For example, the defense pointed out that the search warrant affidavit stated Wash was in custody; when Wash opened the door to the interrogation room, he asked to leave but was denied permission; and Detective Spegal implied Wash was a suspect by saying, "'You understand that in a situation like this, law enforcement will point their fingers at you.'" The court allowed the defense to file a motion to reconsider, but nothing further happened. The court did not revisit its fact-finding.

Granted, Wash's alleged attempts to leave at 8:56 p.m. and at 10:38 p.m. might support his custodial interrogation argument because Detective Spegal confirmed at trial Wash expressed a desire to leave a few times, mentioning it was past his bedtime, and Spegal replied "no." But Wash does nothing to support these missing facts from the suppression hearing record. The video exhibit in the appellate record, spanning 4 hours, 47 minutes, and 7 seconds, does not appear to capture his alleged behavior and lacks a timestamp. It is also unclear whether Wash denied having a gun before or after expressing a desire to leave. See *Vonachen*, 312 Kan at 460. ("It is 'the well-established rule that an appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails.'"); Supreme Court Rule 6.02(a)(4), (5) (2024 Kan. S. Ct. R. at 36) (requiring the appellant to provide a sufficient record and specific citations to support claims of error). Wash also

fails to explain why the district court's fact-findings led to an erroneous legal conclusion, relying solely on his own allegations of conflicting evidence.

We agree with the district court's legal conclusion based on its factual findings. The district court properly admitted Wash's statements to the police.

*District Court Properly Excluded Evidence About Harlan's Fears*

In the district court, Wash sought to introduce Harlan's statements that she believed Theis was going to kill her, arguing they were admissible under the hearsay exception in K.S.A. 2021 Supp. 60-460(j) (declarations against interest). These statements, captured in video recordings of her speaking and her handwritten journals, depicted her struggles in 2014 with drug addiction while Theis groomed her for sex trafficking and threatened her with guns.

The court ruled K.S.A. 2021 Supp. 60-460(j) did not apply because the declarant was the victim, not a party to the case. It acknowledged Harlan's lingering fear of Theis, but no evidence suggested she worried he would inflict additional harm at the time of her murder. It determined the time lapse made her statements "too remote in time" to be relevant. Wash preserved the issue, which he now appeals.

*Additional background*

After aging out of the foster care system at 18, Harlan moved in with Theis. In 2014, she relocated to a women's shelter in Manhattan, Kansas, which supports survivors of sex trafficking and those recovering from addiction and trauma. She remained there until January 2018, when she moved back to Olathe.

51

At trial, the defense sought to admit video recordings and handwritten journals of Harlan as exceptions to hearsay under K.S.A. 2018 Supp. 60-460(j). That evidence was:

- YouTube video of Harlan:  A 20-minute clip posted to YouTube on May 12, 2015, in which Harlan discussed her past struggles with drug addiction, grooming for sex trafficking, and being threatened by Mark with guns before she found refuge at the shelter. In the video, she recounted:  "I was so high . . . . I thought he was trying to kill me, and I got away. . . . Two days later, I went back to him. . . . Then I got very high again, thought he was trying to kill me again, and I called for help."

- Church video of Harlan:  On November 17, 2017, two months before her death, Harlan attended a church event where she shared her story of overcoming substance abuse and being groomed for sex trafficking. Her speech was recorded by an attendee and later provided to the police. In the video, Harlan reflected on her time before seeking help from the shelter, saying that "I was able to get away from Mark. . . . He had made me so scared that I was going to die, that he was going to kill me."

- Eight photos of Harlan's writings:  After the discovery of her body, crime scene investigators found her belongings at her residence, including a journal and notes presumably written by Harlan. Those writings describe her past struggles including her relationship with Mark. She wrote:  "Mark . . . was acting like he was trying kill me," and "it got to the point of I thought he was trying to kill me."

The district court questioned how Harlan's statements could be considered declarations against her own interest, since such declarations typically arise in civil cases.

52

The defense explained Harlan had discussed sensitive topics, including substance abuse and sex trafficking in church settings, arguing this context lent credibility to her statements. The court also inquired about the writings' dates. The defense suggested the undated statements were contemporaneous with the recordings based on their similarities.

The court ruled K.S.A. 2021 Supp. 60-460(j) did not apply because the declarant was the victim, not a party to the case. It acknowledged Harlan's lingering fear of Theis, but no evidence suggested she had any significant concern about potential harm at the time of her murder. The defense made an adequate record at trial to preserve appellate review of the excluded evidence.

*Standard of review*

Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. *State v. Scheetz*, 318 Kan. 48, Syl. ¶ 4, 541 P.3d 79 (2024). Evidence is relevant if it has "any tendency in reason to prove any material fact." K.S.A. 60-401(b). "Relevancy has both a probative element and a materiality element. Evidence is probative if it has any tendency in reason to prove a fact. Evidence is material if it addresses whether a fact has a legitimate and effective bearing on the decision of the case and is disputed." *Scheetz*, 318 Kan. 48, Syl. ¶ 4.

An appellate court reviews a district court's determination on materiality de novo and probative value for abuse of discretion. 318 Kan. 48, Syl. ¶ 5. It also reviews the admissibility of hearsay for abuse of discretion. A court abuses its discretion when no reasonable person could agree with its decision or when its exercise of discretion is founded on a factual or legal error. *State v. Sean*, 306 Kan. 963, 983, 399 P.3d 168 (2017).

53

*Discussion*

The district court excluded the evidence as irrelevant, finding Harlan's thoughts in 2014 that Theis was going to kill her, and her subsequent seeking refuge were "too remote" from the 2018 murder case. Wash sought to admit that evidence to show Theis, not he, was the killer, which is material to establish identity. See K.S.A. 2024 Supp. 60-455(b) (material facts include "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident"); *State v. Burnett*, 300 Kan. 419, Syl. ¶ 2, 329 P.3d 1169 (2014) ("Whether a third party was responsible for the crime a defendant is charged with is clearly a material fact related to determining the defendant's guilt or innocence.").

But Wash cannot show these statements were probative. A defendant's "not-me-but-him" evidence, which suggests a third party may have committed the crime, requires additional proof linking the third party to the crime, such as evidence of presence at the scene, or opportunity and means to commit the crime. Without additional evidence, such claims have "little probative value" and can be excluded at trial. *Burnett*, 300 Kan. 419, Syl. ¶ 3. And a "district court must evaluate the totality of facts and circumstances in a given case to determine whether the defense's proffered evidence effectively connects the third party to the crime charged." 300 Kan. 419, Syl. ¶ 3.

Here, the evidence demonstrated Theis could not move without assistance, was unaware Harlan had returned to Olathe, and had no contact with her since 2014. This means Harlan's thoughts in 2014 had little probative value to the issue of identity in the current case. The district court did not abuse its discretion.

Our determination on this basis means we need not consider the district court's hearsay analysis.

Reversed and remanded.

* * *

STEGALL, J., concurring:  I concur with the result because I agree the State failed to prove beyond a reasonable doubt that the identified prosecutorial errors were harmless. But I cannot join the majority opinion due to the unnecessary and unjustified excessive rhetoric deployed by the majority and designed to exact a pound of flesh from the district attorney. For example, the majority editorializes that the State exhibited a "win-at-all-cost perspective"; that the district attorney "defied the court's order"; and that he "brazenly crossed [the] line." *State v. Wash*, 320 Kan. ___, ___, slip op. at 19-21. While I agree the prosecutor erred by using the word "same" when discussing the ballistics evidence rather than the court-approved word "similar"—in context the practical difference between these two was minimal. The jury had the ballistic evidence in front of it along with the expert testimony that was permitted. The "sameness" or "similar-ness" of the markings is a subjective matter for jury interpretation. How similar must two things be before a jury can conclude they are the same? The court's order in limine did not rule out the jury's ability to conclude the markings were in fact so similar as to support the State's theory that the two casings were fired from the same gun. Given this, while there was error, I cannot agree this error supports a finding that the prosecutor displayed a win-at-all-costs approach or brazenly defied court orders.

Likewise, the majority proves too much when discussing the burden of constitutional harmlessness the State must carry to sustain a conviction tainted by prosecutorial error. The burden is well-settled and is what it is:  the State must prove beyond a reasonable doubt that "no reasonable possibility exists that its error contributed to the verdict." 320 Kan. at ___, slip op. at 21. It is unnecessary and unwise for us to put a judicial thumb-on-the-scale by characterizing the burden as "heavy" or as a "difficult

55

burden for the State in any appeal." 320 Kan. at ___, slip op. at 21, 34. Not least because this characterization is belied by the numerous and common instances of cases in which we regularly find that the State has in fact met this burden. Indeed, reversal for prosecutorial error is, in practice, the exception—not the rule.

This was an aggressive prosecution that made mistakes while walking a very fine line set by the district court and made the not-uncommon error of using the phrase "we know" when discussing controverted evidence. For all the reasons discussed by the majority, the State is unable to demonstrate harmlessness. Reversal is appropriate and—in my view—no more need be said by way of speculation about the State's motives or dubious characterizations of the State's ability to show harmlessness in the abstract.

I concur in the result.